(No. 20870.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS VOZEL, Plaintiff in Error.

*Opinion filed October 23, 1931—Rehearing denied Dec. 4, 1931.*

JESSE PEEBLES, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, VICTOR HEMP-HILL, State's Attorney, JOHN P. MADDEN, and M. F. SEY-FRIT, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error, Louis Vozel, was convicted in the circuit court of Macoupin county of arson and sentenced to the penitentiary. By this writ of error he seeks a reversal of the judgment.

The indictment consisted of seven counts, the third, fifth and seventh of which were quashed on motion of the defendant. The fourth was eliminated by the election of the State's attorney, pursuant to the order of the court, to offer no evidence under it but to proceed under the first, second and sixth counts, which charged the burning of a dwelling house, the property of the defendant.

The commission of the crime (the *corpus delicti*) was clearly proved beyond a reasonable doubt, the only question upon the record which admits of controversy being the connection of the defendant with the crime. The burning of the house was shown by positive direct evidence. In all other respects the evidence was circumstantial. The house was situated at No. 615 North High street, in the city of Carlinville, on the east side of the street and one block north of the square. It was discovered to be on fire about five o'clock in the morning of June 13, 1930, and an alarm was turned in by a neighbor across the street. The fire department responded in a few minutes and extinguished the fire in about an hour, after it had damaged the building, according to the estimate of the fire chief, about $600. It was a two-story frame building facing west, having three rooms on the ground floor and four bed-rooms

and a bath-room in the second story. Nobody was in the house and it was locked when the firemen arrived. The fire was in the second story, at the east side of the house. There was a porch on the east side. The firemen got on the porch roof, broke the window in the southeast room, from which smoke was coming, and turned the water on the fire. There were two rooms in the east part of the house up-stairs, with an east and west partition between them, in which there was a door near the east end, and in each was a window in the east wall looking out on the porch roof. The fire started in the northeast corner of the southeast room back of an old trunk which stood against the wall, and the greater part of the damage was done in the northeast corner of that room and the southeast corner of the northeast room. The partition between the two rooms was burned out for several feet back from the east wall, the floor for six feet north of the partition was burned back several feet into the room, and so it was for several feet south of the partition. The fire burned the partition up into the attic and through the floors of the two rooms to the ceiling of the rooms below and also to the east outside wall, burning a hole to the outside in the south room. There was no evidence how this fire started. The destruction caused by it was confined to the northeast corner of the southeast room, where it started, and the southeast corner of the northeast room. A little south of the middle of the northeast room was a barrel sitting on an oil-soaked comfort, the south and east parts of which had been burned. Two or three hooks were screwed into the outside of the barrel, from which hung burnt rags. In the barrel were paper, rags and refuse stuff saturated with coal oil and there were about two inches of coal oil in the barrel. A piece of wood charred at both ends and with a hole burned through it at the middle was in the barrel. Two empty jugs, one smelling of coal oil and the other of gasoline, were in the room, and two pieces of wax, one apparently

being beeswax and the other paraffin, moulded by hand, with strings running through them, were also in the room, and there was an empty five-gallon coal oil can down-stairs. The barrel was scorched and smoked some on the outside. The paraffin or beeswax bore no evidence of fire. The fire in the corner of the room had not reached closer to the barrel than six feet. There is nothing in the evidence to show that there was any connection between the fire in the corner of the two rooms and the fire which burned the comfort around the barrel, the cloth hanging to the hooks in the barrel and the hole in the plank and charred its two ends.

The barrel sitting on an oil-soaked comfort, with oil and oil-soaked paper in it and burned cloth hanging from hooks on its sides, the board with one side of each end charred and the hole burned in its middle, without connection with the fire, which was in the corner of the two bedrooms, indicate that someone had tried to start a fire centering around the barrel, which probably failed because it was put out in the process of extinguishing the larger fire. These articles, the barrel, the burnt board, cloth and comfort, of themselves give no clue as to how the fire around the barrel was started. They furnished, however, assembled as they were, the means well designed to start a quick conflagration by the application of fire to them, either directly to the contents of the barrel or indirectly through the oil-soaked comfort and the hanging cloths. The paraffin and beeswax, moulded with string or wick therein, suggest the means for the indirect application of the fire. They were well adapted to burn slowly down, and if one were lighted and placed upon the comfort the fire would eventually ignite the comfort. If the board were placed across the top of the barrel and a similar piece of wax were lighted and set in the center of the board, eventually its fire would reach and presumably burn the board in two and it would drop into the oil and oil-soaked papers and start a fire there.

The pieces of wax found were instruments well adapted to cause all the evidences of fire on and around the barrel. They were well designed as a slow match to set fire to the material in the middle of the room. It is probable that the person who formed them formed others like them, some of which were used at the barrel and others to start the fire in the corner of the southeast room. Possibly a fire may start in a vacant house accidentally, but it is highly improbable that two separate, independent fires will start, practically at the same time, in a vacant house without some connection between them. The only reasonable explanation of the evidence is that the material for the fire around the barrel was collected and the fire applied by some device designed to burn and to leave the origin of the fire a mystery, insoluble as soon as the material collected for the purpose should be destroyed.

It is true that the barrel, with its contents of oil, paper, rags and old clothes, the jugs and the beeswax and paraffin had nothing to do with the fire which did the damage to the house, but it is not true that they mean absolutely nothing in this case. It is not true that there is no evidence of any attempt to ignite them. There is evidence that a hole was burned in the pine board, and the jury could properly conclude that a slow match of beeswax or paraffin had been burned but that the fire started had been put out by the firemen before it was fairly started while the other fire had gone far enough to destroy the evidence of its origin. The jury were justified in drawing from the evidence the conclusion that the fire about the barrel was intentionally set, and, having reached that conclusion, in drawing the further inference that the other fire occurring in the same house at almost the same time was also purposely set, for that one fire was purposely set tended to prove that the other was also. (*People* v. *Wolf*, 334 Ill. 218.) In the southeast room the fire-trap was destroyed by the fire; in the northeast room it was saved by the firemen to fur-

nish evidence that no defective electric wire or rat or mouse was responsible. The jury could not have arrived reasonably at any other conclusion than that the fire was of incendiary origin.

The evidence connecting the defendant with the crime was altogether circumstantial. A few minutes before 2:00 o'clock in the morning of June 13, three hours before the fire, two policemen, Bloomfield and Kaufman, testified that they saw Vozel across the street from them walking rapidly from the north and turning west at the square toward the interurban station. They went to the station a few minutes later and there again saw him. The train came in at 2:10 and he got on the car. Albert Irwin, the conductor of the interurban train, testified that he received one . passenger on that train at Carlinville that night, whom he described by apparent age. and weight, who bought transportation to Springfield. There was also evidence that the house was insured for $3000 in favor of the plaintiff in error and the Carlinville Loan and Building Association as its interest may appear.

Plaintiff in error denied any connection with the crime or knowledge of it until he received a telegram at his home in Detroit about noon on June 13 from the fire chief at Carlinville. He testified as follows: He was an Austrian but had been naturalized, was fifty-one years old and came to Carlinville in 1919, where he worked for the Standard Oil Company and afterward was a coal miner. He built the house in question six months after he came to Carlinville and lived in it with his family, his wife and three children, until he went to live in Detroit in July, 1928, his family having preceded him. After that time he lived and worked in the city of Detroit. He came back to Carlinville in March, 1930. He was out of work then. He remained in Carlinville until June 8, occupying the house with his son Victor. The whole family had gone to Detroit, but Victor only stayed three months, when he came back to

Carlinville to go to school and had been going to school until June 2, 1930, when he graduated from the high school. When the family went to Detroit they took most of the furniture with them but left enough so that when any of the family were there they could sleep and cook there. After Victor's graduation in June he and his father went to Detroit by automobile, leaving Carlinville about 11:00 o'clock Sunday night, June 8, and arriving at Detroit the next afternoon. The father did not return to Carlinville until September, when he was arrested. He got the telegram from the fire chief telling him of the burning of his house on Friday, June 13, about noon. It was delivered at his house in his absence. He testified that he did not set fire to the house, knew nothing about it and never saw it until the trial. The jugs did not belong to him. He was in the northeast room on Saturday and there were no jugs or barrel in the room. On cross-examination he was asked if he was not in Chicago on Wednesday night and if he knew Anton Wyaskie, and he answered no to both questions. His daughter testified to her father and Victor's arrival in Detroit on Monday, June 9, and to his receipt of the telegram on Friday, June 13, about 11:00 o'clock, and that he was there every day from the ninth to the thirteenth.

Victor Vozel testified that he and his father arrived at Detroit on Monday afternoon, June 9, and that his father had not left Detroit until Victor left on the night of the twelfth, to his knowledge. He was in the northeast room up-stairs, Sunday afternoon before they left, and the barrel and jugs were not there. William Kennedy and George Lavergne also testified that the defendant did not leave Detroit from June 9 until after the fire.

In rebuttal Anton Wyaskie testified that he was a coal miner, who had lived in Carlinville eleven years and had known the plaintiff in error nine years, and that he saw him at the bus station in Chicago on the afternoon of June 11, 1930. Wyaskie had been in Chicago three weeks

looking for work and was returning to Carlinville by the bus at 5:00 o'clock. The plaintiff in error told him that he was going to Detroit at 5:00 o'clock.

If the testimony of the two policemen is to be believed the plaintiff in error was in Carlinville three or four hours before the fire and left the city at that time, and the train conductor's testimony shows that he went to Springfield. This alone does not show that he set this fire. It was, however, set by somebody. The house was locked and it does not appear that any other person had a key to it. It is a fair inference that he had a key and no one else had. The house was insured for his benefit and by this a motive appears. It is argued that this evidence should not have been admitted as it was secondary and not the best evidence since the witness testified from his record of insurance. No objection to it was made for this reason but only because it was not admissible under the indictment. No reason appears for his return to Carlinville. He went on the witness stand, and instead of explaining that his presence in Carlinville had a justifiable and honest motive he denied that he was there, testified that he was at home in Detroit from Monday afternoon until after the fire, and denied that he was in Chicago on Wednesday afternoon. It is testified by Wyaskie that he saw the plaintiff in error in Chicago on Wednesday afternoon, and the only answer of the plaintiff in error is that he does not know Wyaskie and was not in Chicago. The case of the People is that no one but the plaintiff in error had access to the house, that no one else had any motive to burn it, that the plaintiff in error had both the motive and the opportunity, that he knowingly testified falsely to the material fact in regard to his presence in Carlinville, and his testimony is therefore unworthy of belief. On the other hand is the testimony of the alibi witnesses that he was not at the place where the crime was committed at the time of its commission. The law is that the determination in such a case is for the

jury, which alone has the duty and the responsibility of weighing the evidence and determining the credibility of the witnesses. The court is not authorized in such a case to set aside the verdict of a jury, approved by the judge by overruling a motion for a new trial and entering judgment, unless there is clearly a reasonable doubt of the defendant's guilt. In our judgment the verdict is justified by the evidence.

The court refused the following instructions asked by the plaintiff in error, and it is argued that such refusal was erroneous:

1. "The court instructs the jury that a reasonable doubt is that state of the case which, after due hearing and considering all the evidence, leaves the minds of the jury in such condition that they cannot say that they have an abiding conviction, amounting to a moral certainty, that the defendant is, in fact, guilty as charged. And, unless you are so convinced of the defendant's guilt, it is your duty to find him not guilty.

2. "The court instructs the jury that it is your sworn duty to give the defendant in this case a fair and impartial trial. He is entitled to all the rights that the law gives any defendant in a criminal case, and you have no right to convict him unless his guilt has been proved as required by law.

3. "The court instructs you that it is a rule of law in Illinois that before a conviction can be had upon circumstantial evidence the guilt of the accused must be so thoroughly established by the evidence as to exclude every other hypothesis."

The principle announced in the first of these instructions was given in the following language contained in instruction No. 4 given at the request of the People: "The jury are satisfied beyond a reasonable doubt when they can say upon their oaths, after a fair and impartial consideration of all the evidence introduced in the case, that they have an abiding conviction of the truth of the charge

made in the indictment in this case." This instruction states that the jury are satisfied beyond a reasonable doubt when they can say that they have an abiding conviction of the truth of the charge. The instruction asked by the plaintiff in error states, in substance, that a reasonable doubt is where the jury cannot state that they have an abiding conviction, etc.,—that is, there is no reasonable doubt if the jury, after considering all the evidence, have an abiding conviction of the guilt of the defendant, and there is a reasonable doubt if the jury have not an abiding conviction of such guilt. The proposition stated in either form has the same meaning, which men competent to sit as jurors cannot misunderstand. The quotation from instruction 4 has been repeatedly approved. (*People* v. *Tielke,* 259 Ill. 88.) The words "amounting to a moral certainty," contained in the instruction asked by the plaintiff in error, add nothing to the meaning of the quotation from People's instruction 4. A belief "beyond a reasonable doubt" is not made more definite and certain by calling it "an abiding conviction" or "a moral certainty." The terms have been used in instructions attempting to define a reasonable doubt and approved, but it is not necessary to use both or either of the last two expressions in defining a reasonable doubt.

The second of the refused instructions is a mere general statement, of no value in the determination of the case. What constitutes a fair trial and the rights which the law gives to a defendant and the necessity of proof of his guilt as required by law are all stated in other instructions given by the court. The doctrine of reasonable doubt, burden of proof on the People and presumption of innocence were all stated in the instructions given, and nothing is suggested which should have been given but was omitted.

The third refused instruction was covered by given instructions 6 and 11.

A point stated in plaintiff in error's brief is that the admission of evidence that the property was insured, un-

explained, was reversible error. No authority is cited and the point is not further discussed. The evidence was admissible to show a motive. The presumption is that a man will not purposely burn his own property. Where the property is vacant, and has been so for some time, it is proper to show that the property was insured and that the burning might result in turning it into cash.

The first point in the brief is that the challenge to the array of jurors upon the ground that the jurors were selected from jury lists containing the names of both men and women should have been sustained by the court. The bill of exceptions shows nothing about the jury lists or the selection of jurors. Nothing is therefore presented for consideration on this point.

The judgment is affirmed.      *Judgment affirmed.*