THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RAY MILLER, Defendant-Appellant.

First District (5th Division)   No. 76-448

Opinion filed December 2, 1977.

James Geis and Rebecca Davidson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of arson (Ill. Rev. Stat. 1975, ch. 38, par. 20—1(a)) and sentenced to a term of five to 15 years in the Illinois State Penitentiary. On appeal he contends that: (1) the trial court committed prejudicial error when it permitted the jury to hear evidence of fires which occurred several days after the arson, (2) his right to due process of law was violated when he was identified in an improperly suggestive lineup by an eyewitness who had a limited opportunity to observe, and (3) the sentence imposed was excessive.

The following pertinent evidence was adduced at trial.

*For the State*

*John DeGuide*

He is the current owner of Royal Television and Stereo, which is also referred to as Royal T.V., and the former owner of a hot dog stand located at 806 Waveland. In February 1975 he and defendant argued over his discharge of defendant's girl friend, Dana Ball, from his employ.

Defendant then broke one of Royal T.V.'s plate glass windows. On May 11, 1975, the hot dog stand burned down. On May 16, 1975, there was a fire at Royal T.V. and he found that some newspapers and other debris had been stuffed inside the store through a mail slot.

On cross-examination he admitted that he neither was present when the fire at the hot dog stand started nor did he see anyone start the fire.

*Harvey Lemke*

He lives in Chicago and works as a newspaper deliveryman. On May 11, 1975, at approximately 3:30 a.m. he was walking towards the office where he picks up his newspapers when, from a distance of approximately three car lengths, he saw defendant knocking on the window of the hot dog stand located at 806 Waveland. He told defendant that there was nobody there. Defendant broke the window with his left elbow, made a motion of throwing something inside, and walked away towards the alley. He went to his place of business and called the fire department. After he finished delivering his newspapers he went back to the hot dog stand. Three or four fire trucks were there and the building was all burned up. On May 16 he viewed a five man lineup. He picked defendant out of the lineup and identified him as the man he had observed at the hot dog stand on May 11.

On cross-examination he admitted that on May 11 at 3:30 a.m. it was dark outside, but explained that he could see because there was a light in a nearby alley.

*Robert Schmidt*

He lives on the third floor of the same building which houses Royal T.V. He awoke on May 16 at 3 a.m. and smelled smoke. He and some neighbors went outside and found that a door in the service alley, which from the outside would appear to be the rear door to Royal T.V., was burning. He walked to the front of the building and from close range observed defendant walking back and forth in front of the courtyard. Defendant then walked up to the service entrance and down the street. He went back up to his apartment where he heard a noise. Looking outside, he saw defendant running through the serviceway. He went downstairs into the courtyard and saw defendant standing on the corner across the street from the building. The next time he saw defendant was at approximately 5 p.m. on that same day when, without any assistance, he picked defendant out of a lineup.

On cross-examination he admitted that he had no knowledge whatsoever about a May 11 fire at a hot dog stand.

*Officer Rodriquez, Chicago Police Officer*

In the mid-afternoon of May, 16, 1975, he arrested defendant at his home and placed him in a lineup with four Chicago police officers. They all were similarly dressed.

On cross-examination he admitted that he had nothing to do with an investigation of a fire which occurred on May 11.

*Richard Julien, Chicago Fireman*

He is a trained and experienced investigator for the Chicago Fire Department. On the morning of May 11, 1975, two fires occurred at a hot dog stand located at 806 Waveland. The first fire, which was relatively minor, had occurred at approximately 4 a.m. and the second fire, which was severe, was discovered at 8 a.m. Upon arriving at the scene, he observed a severe burning in and around the entire store area and a deep charring of the counter and floor. He detected a distinct odor of gasoline. He spoke to Harvey Lemke who told him what he had seen that morning. Based on his observations and his experience, his opinion was that the fire was of incendiary origin.

On cross-examination he admitted that he smelled gasoline at approximately 8:30 that morning, but explained that depending on various factors, the gasoline could have come from either the 4 o'clock or 8 o'clock fire.

*Dennis Kelly, Chicago Police Officer*

On May 16, 1975, at approximately 3:30 a.m., he and his partner were on duty and were driving a squadrol in the vicinity of 806 Waveland. He noticed defendant in an alley leaning against the back wall of the hot dog stand. After finding that defendant was intoxicated and could not explain his actions, he took him into protective custody. He then searched defendant and found 10 to 15 books of matches. On a windowsill directly above the spot where defendant had been leaning he found a can of lighter fluid. A report he made of this incident indicates that it took place at 4:55 a.m. Defendant was released a few hours after his arrest.

*Lawrence Glass*

He owns and lives above a tavern which is next door to the hot dog stand located at 806 Waveland. This hot dog stand burned down on May 11, 1975, and his apartment filled with smoke. He quickly seized his children and left the apartment. On May 16, at the back door of his tavern and in an opening where the hot dog stand had been boarded up, he found a bunch of curled up newspapers.

On cross-examination he acknowledged that there had been two fires on May 11, one at 4 a.m. and one at 8 a.m.

*Carol Faust*

She was the owner and sole proprietor of the hot dog stand at 806 Waveland which she had purchased on April 1, 1975, from John DeGuide. On May 10 she left her business at approximately 9 p.m. When she returned the next morning at approximately 10 o'clock her business was completely burned out. She did not give anyone permission to burn down her hot dog stand.

*Defendant on his own behalf*

He lives at 1325 West Wilson which is nine or 10 blocks from the hot dog stand. In February 1975 he visited DeGuide at Royal T.V. and DeGuide told him that Dana Ball was fired. After arguing with DeGuide he turned to leave, slipped, and cracked one of the store's windows. DeGuide later called him and asked him when he would pay for the window. When he said that he had cracked the window accidentally, DeGuide insisted that he pay for it, and threatened that he would "be sorry for it." On numerous occasions when Dana Ball was working at Royal T.V. in the narrow space behind the counter, DeGuide would go behind the counter and brush against her as he went past. DeGuide also asked her to wear low cut blouses to work and to "go braless" so that she could lure customers in. He was familiar with the layout of Royal T.V. and the courtyard building it is in since he had once helped DeGuide move merchandise into the store. He knew there had been a fire at that store. He knew nothing about a May 11 fire at the hot dog stand until he was arrested on May 16 and charged with arson. He had not been in the New Town area, where the hot dog stand was located, for approximately a month before May 16.

On cross-examination he denied being upset or bearing a grudge against John DeGuide. He admitted that as of May 11 he did not know that John DeGuide had sold his hot dog stand. He acknowledged that he was arrested on May 16, 1975, at 4:55 a.m., but explained that he had been drinking at a bar named Friar Tuck's from 2 a.m. to 4 a.m. and was arrested as he was walking home. He testified that the officer who searched him found only four or five books of matches, and that he knew nothing about a can of lighter fluid.

*For the State on rebuttal*

*John Wong*

He is the manager of a single's bar named Friar Tuck's. On May 16, 1975, Friar Tuck's closed at 2 a.m. and it would have been impossible for someone to leave the bar at 4 a.m.

On cross-examination he acknowledged that there are approximately five other bars within a two-block radius of Friar Tuck's.

OPINION

■■ Defendant first contends that at his trial for an arson which occurred at a hot dog stand on May 11, 1975, the court committed prejudicial error when it allowed the introduction of evidence linking him to the fires which occurred at or near Royal Television and Stereo on May 16, 1975. The State, arguing that the evidence was properly admitted, points out that while evidence that a defendant committed crimes other than the one for which he is charged is generally not admissible, such

evidence can be admitted if it is relevant to show such facts as motive, intent, or identity. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.) Emphasizing that this is an arson case, the State also cites two early cases, *People v. Vozel* (1931), 346 Ill. 209, 178 N.E. 473, and *People v. Wolf* (1929), 334 Ill. 218, 165 N.E. 619, which held that at a trial for arson, evidence of "other" fires could be introduced to show that all of the fires were committed by the defendant as part of a connected scheme or purpose. The State therefore argues that the evidence linking the defendant to the fires which occurred on May 16 was properly admitted to show that those "other" fires, and the arson for which defendant was charged, were committed as part of a common scheme, motivated by defendant's desire for revenge against John DeGuide.

■■ We cannot agree with the State's argument. Evidence of "other" crimes cannot be admitted even for one of the purposes mentioned above, until it is shown that a crime actually took place, and that defendant committed it or participated in its commission. (*People v. Scott* (1973), 13 Ill. App. 3d 620, 301 N.E.2d 118.) In contrast to the evidence which was introduced regarding the May 11 fires, it was not shown at trial that defendant participated in the commission of the May 16 fires, or even that they were of incendiary origin. Defendant was observed at the scene of the May 16 fires by a resident of the building at which they occurred. Mere presence at the scene of a crime is certainly not sufficient to establish guilt. (*People v. Hendricks* (1976), 41 Ill. App. 3d 178, 353 N.E.2d 177.) Additionally, however, the State stresses a police officer's disputed testimony that when he arrested defendant on May 16 he found him to be in possession of 10-15 books of matches and standing near a can of lighter fluid. The State also points to the testimony of two witnesses who found newspapers stuffed through openings in their stores. Although we agree with the State that when evidence of other crimes is admitted to show motive or a common scheme, proof of the other crimes need not be beyond a reasonable doubt (*People v. Smith* (1972), 3 Ill. App. 3d 958, 279 N.E.2d 512), the evidence summarized above amounts to little more than a suspicion that defendant was involved in the commission of the May 16 fires, or that they were criminal acts. We therefore cannot find that the State has met its burden of competently showing that another crime occurred, and that defendant committed it or participated in its commission. (Compare *People v. MacRae* (1977), 47 Ill. App. 3d 302, 361 N.E.2d 685.) Moreover, our conclusion does not conflict with *People v. Vozel* (1931), 346 Ill. 209, 178 N.E. 473, or *People v. Wolf* (1929), 334 Ill. 218, 165 N.E. 619, upon which the State relies. In both *Wolf* and *Vozel,* "other" fires occurred at or about the same time and in the same immediate area as did the arson for which defendant was charged.

Due to that close connection, the "other" fires were allowed into evidence to show that all of the fires were purposely set by the defendant as parts of a connected scheme. In the present case, however, the fires occurred independently of each other, on different dates and at different locations. Therefore, the mere fact that this is an arson case will neither suspend the general rule barring the introduction into evidence of other crimes, nor dispense with the foundation which must be laid before an exception to that rule can be made. For the reasons indicated above, we must conclude that the State did not lay an adequate foundation for the admission of the May 16 fires into evidence, and that their admission posed a substantial likelihood of prejudice to defendant.

■■■ Although the judgment entered below must be reversed and the cause remanded for a new trial, an issue which commends itself to our current attention is defendant's contention that his right to due process of law was violated when he was identified at a lineup by Harvey Lemke, an eyewitness to the May 11 arson. Defendant principally argues that the fact that he was the only man in the five man lineup who had long, light-colored hair rendered the lineup prejudicially suggestive, especially since the length and color of his hair was the focal point of Lemke's identification. We disagree. The complaint that there were considerable differences between the size, age and appearance of a suspect and the other lineup participants goes to the weight of the evidence, rather than to its admissibility. (*People v. Norfleet* (1972), 4 Ill. App. 3d 758, 281 N.E.2d 761.) The record shows that defendant was placed in a lineup with four other male Caucasians of approximately the same height, weight and dress. The physical differences between defendant and the other men were therefore not so prejudicial or suggestive so as to give rise to a substantial likelihood of misidentification. (*People v. Davis* (1974), 21 Ill. App. 3d 177, 315 N.E.2d 79.) Moreover, the same eyewitness who picked defendant out of the lineup later identified him at trial. The existence of an independent origin for the identification of the accused will validate an in-court identification, even though a previous identification procedure may have been impermissibly suggestive. (*People v. Connolly* (1973), 55 Ill. 2d 421, 303 N.E.2d 409.) Contrary to defendant's argument, Lemke's trial testimony that he observed defendant for several minutes by the light of a street lamp and from a distance of approximately three car lengths clearly indicates that he had an origin for his in-court identification sufficiently independent of the allegedly suggestive lineup.

Based on the foregoing discussion, the judgment of the circuit court is reversed, and this cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

MEJDA and WILSON, JJ., concur.