THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GEORGE HANEI, Defendant-Appellant.

Fifth District    No. 78-312

Opinion filed March 18, 1980.

John H. Reid and Randy E. Blue, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Martin N. Ashley and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Defendant appeals from a judgment rendered upon a conviction by a jury of the crime of murder. The sentence imposed was 40 to 80 years imprisonment. The indictment charged, and the People proved to the jury's satisfaction, that defendant had caused the death of his father by poisoning. Multiple issues are raised and will be stated following a recital of the facts.

The indictment under which defendant was tried contained two counts. Count I alleged he had murdered Herman Hanei (his father), on December 3, 1976, and count II alleged he had murdered Katie Roessel on December 10, 1971. Each offense was alleged to have been committed through the use of a metallic poison, thallium. Defendant was tried only on count I in a trial which convened January 14, 1978.

The principal witness for the People was Geneva Hanei, the widow of the deceased and mother of the defendant. She testified that on December 3, 1976, deceased had consumed a breakfast of oatmeal and eggs. He then left the house to go to a restaurant and to Kroger's. At the restaurant he was observed to have two cups of coffee. He returned home at approximately 10 a.m. and sat down to rest. About 10 minutes later the

defendant came to the house to ask his father how to kill a goat. Defendant told his parents that there was a box outside on the sidewalk. He went out and returned with the box, opening it to find four doughnuts. Suggesting that they eat them for lunch, defendant took one. The deceased then selected a cherry one. Two doughnuts, one with chocolate and the other with white icing, remained. The witness ate none. After consuming half his doughnut, the deceased commented that it tasted bitter but, nevertheless, finished eating it. Ten or fifteen minutes after the men had finished their doughnuts, defendant departed. Before and during this time the decedent had been in good health. Shortly thereafter the deceased began to vomit and show other signs of illness. Between 8 and 9 o'clock that evening he was taken to the hospital where between 1:30 and 2 o'clock the next afternoon, he died. On autopsy, death was ascribed to thallium poisoning.

On cross-examination Mrs. Hanei testified that defendant had not indicated to the deceased which of the doughnuts he should eat. She also stated that it was common knowledge that the deceased preferred "plain doughnuts" and the two doughnuts remaining in the box were plain doughnuts.

Though out of order in which the evidence was received, we will pursue for the moment the doughnut-eating incident. Defendant testified in his own behalf. He stated that he had gone to the home of the deceased at about 10:30 a.m. on December 3, 1976. He took nothing with him to the house. He was asking his father's advice on how to butcher a goat for meat and remained for about 10 minutes to talk to him. As the defendant and his parents left the house, his father walked over and picked up a small white box sitting atop a garbage can. The box was opened, disclosing about a half dozen doughnuts. Deceased stated, "Margie [a daughter] probably brought that down and put it there." Deceased then suggested they have a little lunch and they all returned to the kitchen. The deceased stated, "I'll take that cherry one in there." Defendant denied taking the doughnuts to the house.

The testimony of Mary Volger, a registered nurse, was offered by defendant. She was on duty in the emergency room of Alton Memorial Hospital when the deceased was brought there at about 8:50 p.m. on December 3, 1976. When she was taking deceased's history he stated that his illness started after he had eaten some doughnuts he had found on his back porch and that he had gone out on the back porch to get the doughnuts. Deceased made no mention of the defendant.

The People presented the testimony of Dr. H. Frank Holman, a pathologist who worked with the Smith-Kline Clinical Laboratory Group in St. Louis. At the request of the county coroner he performed an

autopsy on the body of the deceased. As part of the procedure he withdrew samples of blood and gastric content for toxicological study. He stated that the finding of that study was the presence of a large amount of thallium in the blood and no other drugs or chemicals were found. He related that the level of thallium in the blood was a toxic level and was the cause of death. The report from the laboratory was that there were 2,550 micrograms per 100 c.c. of blood which the Doctor described as a "high level" and a "lethal level."

On cross-examination Dr. Holman stated that the thallium was introduced into the body of deceased relatively recently. He conceded that he was not an expert on thallium poisoning.

Defendant presented the testimony of Alphonse Poklis, director of the forensic and environmental toxicology laboratories of St. Louis University. He testified that thallium is tasteless. He recounted an experiment he had conducted in which he had placed a lethal dose of thallium in a doughnut. He then chewed a 10-gram section of the doughnut and had tasted no bitterness and had been unable to detect the presence of the thallium.

Leonora Hanei, sister-in-law of the deceased, testified that following his death on December 4, 1976, she went to the home of deceased and got a box containing doughnuts and took it to the hospital. The box was in a brown paper sack. She did not know how many doughnuts were in the box, but she had seen the box at the home when she arrived there in the middle of the night on December 3.

Jacquelin Burjes received the brown paper bag at the hospital, stating that it was thought to contain doughnuts which the deceased had eaten. She had not opened the bag but had wrapped it in plastic and sealed it. She subsequently gave the bag to an Alton policeman, Officer Cunningham. The officer looked into the bag and saw that it contained a white box similar to People's exhibit No. 8. He did not open the box but took it to the police department, tagged it as evidence and placed it in an evidence locker. On December 13, 1976, two "longjohn doughnuts" and a white cardboard box were shipped to the FBI Laboratory in Washington.

Defendant had filed a pretrial motion to suppress the results of any analysis of the cardboard box and doughnuts, but the motion was denied and the evidence admitted.

An FBI special agent performed tests on the items received. He scraped from the bottom and sides of the box what appeared to be the remains of doughnut icing. Test results were that there was a very small amount of thallium present. It was described as being on the order of a third of a part per million which would not have had any toxic effect on an individual. Test results on the doughnuts disclosed one with white icing

contained no thallium and one with chocolate icing contained thallium in a concentration of approximately one part per million, described as a trace quantity with no toxic effect.

Officers of the Alton Police Department obtained a search warrant to search defendant's premises and in a search on September 21, 1977, they seized a mortar and pestle. These were tested by a chemist for the Illinois Department of Public Health for the presence of thallium and thallium was found. The chemist admitted he had never before performed a test for the presence of thallium, and he admitted that there were places in the analysis guide book that required him to make his own decisions as to what operative parameters to use. He conceded that while the mortar and pestle were in his laboratory they were not locked up but were out in the open, accessible to anyone who might come into the laboratory.

Defendant's pretrial motion to suppress the mortar and pestle, and the results of the tests performed upon them, was denied and the evidence was admitted.

Personnel from the State Public Health Department Toxicology Laboratory testified in detail regarding the receipt, handling and testing of the mortar and pestle. They were received in the Chicago office from the Alton police by certified mail. They were kept on the evidence shelf in a locked room of the toxicology laboratory. They were sent by departmental courier to the heavy metals testing laboratory of the department for testing. Detailed descriptions of the methods of packaging and handling were given.

The mortar and pestle ultimately were delivered by George Perry, a chemist employed by the department, for performance of the tests. Thallium was described as a rare metallic element. Mr. Perry described the test for determination of the presence of thallium in great detail. When asked the name of the test performed he stated, "I was running a graphite furnace of a Perkin Elmer atomic absorption spectrophotometer." Briefly and superficially described, the test consisted of comparing of a known sample of thallium with an acid solution of the suspect substance prepared from the mortar and pestle. The testing was done in the heavy metals room of the Springfield laboratory and Mr. Perry related that perhaps 30 different people would have had access to the room.

Mr. Perry was subjected to a lengthy and rigorous cross-examination regarding all phases of the testing procedure and the results of the test.

Over defendant's continuous objection and request for mistrial the People presented the testimony of William Rogers. Between April and June of 1974 he was an attorney practicing with the Alton firm of Pratt, Kardis and Strawn. In that period of time a man identified as defendant had come in and asked him to prepare a deed transferring a small

residential property in Alton from his mother and father to him. Rogers did not recall the father's name or the location of the property. He stated that the man told him his father was terminally ill with cancer. Rogers directed preparation of the deed which was typed by secretary Barbara Garvey. He charged $20 or $25 which would have been shown in the firm's books as miscellaneous income.

Defendant presented the testimony of Barbara Garvey and Vicki Jackson, secretaries of the law firm, both of whom testified they did not remember preparing a deed from Herman Hanei and wife to George Hanei. Paul Pratt, sole stockholder of the law firm, testified to the bookkeeping procedures followed by the firm. He related that any fee paid for preparation of a deed would be given to the preparing attorney who would then give it to the in-house accountant who would record its receipt by client name. Mr. Pratt had examined the records of the firm for the period in question and stated that defendant's name did not appear.

The widow of deceased testified that the deceased and the defendant did not get along well but the last argument between them had been over 30 years previously and concerned a subject she did not recall. Donald Hanei, a brother of defendant, related that in June 1973 he saw the defendant point his finger at deceased and say, "God damn you. Someday I'll get you. You wait and see." There was also evidence that defendant had been cut out of his parents' will.

The People introduced evidence relative to the death of Katie Roessel. Defendant's pretrial motion to preclude any such evidence had been denied as were defendant's renewed objections as the evidence was being presented.

Katie Roessel had died on December 29, 1971, approximately 5 years prior to the death of Herman Hanei. Dr. John Mueller, a clinical pathologist at Alton Memorial Hospital, performed an autopsy on the body of Katie Roessel on the day she died. His report concluded she had died as a result of myocardial infarction occasioned by generalized arteriosclerosis, myocardial insufficiency, anoxia and diffuse hemorrhagic duodenitis. This testimony of Dr. Miller was offered by defendant as rebuttal to testimony by Dr. William Drake, a pathologist called by the People.

Dr. Drake performed an autopsy on the exhumed remains of Katie Roessel on June 22, 1977. The body had been exhumed for the purpose of performing toxicological analysis on the tissues. Based upon his autopsic observations and the toxicological test results, Dr. Drake stated that the cause of death of Katie Roessel had been cardiovascular collapse due to thallium poisoning. Dr. Drake further stated that laboratory reports on analysis of the various tissue samples he submitted showed high levels of thallium in practically every tissue, and the levels were toxic.

To link defendant with the death of Katie Roessel the People called an Edwardsville attorney for testimony regarding some real estate transactions between defendant and Katie Roessel. The attorney had taken depositions from defendant in connection with lawsuits concerning the validity of some deeds. The depositions had been taken on September 28 and December 16 of 1976. The depositions contained what the People asserted were admissions against interest by defendant.

The attorney testified that defendant had stated that he had known Katie Roessel since 1966 or 1967 and had purchased eggs from her on a regular basis, about once a week. He identified People's exhibit No. 16 as being a deed dated March 3, 1969, conveying a 160-acre farm from Katie Roessel to one Frieda Kriesol. The defendant indicated that he was Frieda Kriesol and that he had used the fictitious name by agreement with Katie Roessel. Defendant admitted that he had notarized the deed on December 7, 1971. There had been no consideration paid for the deed.

The attorney identified People's exhibit No. 17 as a certified copy of a deed dated January 7, 1972, conveying the 160 acres from Frieda Kriesol to one Leo J. Soberri, Sr. The defendant was alleged to have prepared this deed. Exhibit 18 was a power of attorney from Leo Soberri, Sr., to defendant dated January 6, 1972, allegedly prepared by defendant, and exhibit 19 was a certified copy of a deed from Leo J. Soberri, Sr., to defendant dated January 7, 1972, also allegedly prepared by defendant. This latter deed had been recorded on July 3, 1974.

We first consider defendant's argument that the People failed to prove beyond a reasonable doubt that he caused the death of his father by poisoning. The argument must be rejected, for we find the verdict of the jury to be supported by the evidence and that it was not brought about by any passion or prejudice. The jury could, and obviously did, find that the unusual and unique circumstances served inexorably to link defendant to the death of his father by poisoning with thallium.

Defendant concedes that Herman Hanei died of thallium poisoning. The open questions were what was the source of the thallium and did defendant knowingly induce the deceased to ingest thallium?

After finishing breakfast on the fateful day the deceased went to a local restaurant where he was seen to consume two cups of coffee. He stopped by the Kroger store. Shortly after he arrived back home his son, the defendant, arrived, his first visit in two to three weeks. The defendant's visit coincided with the onset of the fatal illness. Defendant stated that he went to the home to ask his father how to butcher a goat. There was evidence concerning a box which curiously had appeared outside the house and which was found to contain doughnuts. The widow of the deceased testified that defendant said that when he entered the

house he passed a box sitting on the sidewalk. Defendant testified that as he was leaving the house he saw the box sitting on a garbage can; he stated that the deceased remarked that his daughter had probably left it there. Under either view the defendant brought the box into the house, opened it, saw that it contained doughnuts and made the suggestion that they eat them for lunch. Defendant took the first and deceased selected a "cherry" doughnut. Deceased remarked that his doughnut tasted bitter but he consumed it all. After the doughnuts were eaten defendant left. Almost immediately the deceased became ill, got progressively worse, was hospitalized, and died early the next afternoon. The deceased had previously been in good health. That the death was the result of thallium poisoning is not disputed.

Laboratory examination of the remaining doughnuts and the residue in the box disclosed traces of thallium. We think it entirely reasonable for the jury to infer that the deceased ingested the thallium by eating the doughnut.

Defendant denies that he took the box to the home of deceased. Yet the appearance of the box of doughnuts and the appearance of the defendant at the home coincided, and it was defendant who called attention to the box and took it into the house and suggested eating. Defendant testified that deceased said that a daughter probably left the box of doughnuts on a garbage can. The jury doubtless considered defendant's version of the arrival of the box; they also doubtless considered that this would be a very unusual manner for a daughter to deliver doughnuts to her parents, and they thus considered this version implausible.

Fairly considered, these circumstances warrant the belief and the finding that defendant did in fact take the box containing the lethal doughnut to the home of the deceased and induced the deceased to consume it.

Since murder is a specific intent crime, a necessary ingredient of defendant's guilt would be that he had knowledge that the doughnut contained the thallium that caused the death of decedent. Thallium was described as a rare, highly toxic metallic element. It is not found in foodstuffs. In a search of defendant's premises pursuant to a warrant police seized a mortar and pestle in his garage which laboratory examination disclosed to have contained thallium. Defendant was thus shown to have a connection with the toxic substance.

There was additional evidence presented to the jury that tended to show defendant's connection with thallium. Over defendant's pretrial motion to suppress and in-trial objection, the People were permitted to introduce evidence relating to the cause of the death of Katie Roessel and

further evidence that would tend to show a motive for defendant to have brought about her death. The chain of events leading to and the mode of death of Katie Roessel were similar to the events leading to the death of Herman Hanei.

■■ Defendant objected that such evidence was not probative of any issues in this case and only constituted evidence of a crime other than that for which he was being tried. The People presented the evidence of Katie Roessel's death as evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi* of the defendant in the present case. Such evidence, if it tends to prove a fact in issue, is admissible though it may be evidence showing that the accused has committed another crime other than the one for which he is being tried. *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

We think the evidence regarding the cause of death of Katie Roessel and the transactions involving defendant's acquisition of a deed to Katie Roessel's 160-acre farm were properly received as tending to prove in this case defendant's motive, intent, absence of mistake and *modus operandi*. The character of the deaths of Herman Hanei and Katie Roessel by thallium poisoning was similar, and the *modus operandi* gave the appearance that the two deaths derived from a common source. Defendant was well acquainted with both of them and had made attempts to acquire deeds to real estate from both. Furthermore, defendant was shown to have some affiliation with the rare and highly toxic poison, thallium. Although none of these propositions were established to a certainty there was sufficient evidence in each instance to raise the inference and it then rested with the jury to make the final determination. We cannot set aside their conclusion as being against the manifest weight of the evidence. To the contrary, we, along with the trial court, believe the conclusion of the jury is fully supported by the evidence.

Defendant made an additional objection to the admission of evidence surrounding the death of Katie Roessel, and that was that there was no, or insufficient, evidence to show that her death had been brought about by a criminal agency or that defendant had had any part in her death. Defendant cites and relies on *People v. Miller* (1977), 55 Ill. App. 3d 421, 370 N.E.2d 1155, and *People v. Scott* (1973), 13 Ill. App. 3d 620, 301 N.E.2d 118. Those cases stand for the proposition that before evidence of other crimes can be admitted (to show motive, intent, etc.) it must first be shown that a crime actually took place and that defendant committed it or took part in its commission. That rule is undoubtedly good law, but we are of the opinion that it is not conclusive of the issue here. The *Miller* and *Scott* cases held that under their facts the

commission of another crime and the defendant's involvement therein had not been demonstrated.

■■ The leading case in Illinois on this particular point is *People v. Spaulding* (1923), 309 Ill. 292, 141 N.E. 196. There the defendant was being prosecuted for a murder. One Schorr was an accomplice in the killing and had talked to the police about the incident. Subsequent to the murder for which the defendant was being tried a body was discovered buried about three-fourths of a mile from defendant's remote hideout cabin. The cabin burned shortly after Schorr's disappearance. At defendant's trial the People presented evidence tending to show that defendant lured Schorr to the cabin, shot him, buried him and burned the cabin to erase any evidence of the killing. Defendant's objection was that the evidence concerning the Schorr killing was that of a crime other than the one charged in the indictment and was thus inadmissible. The supreme court held the evidence admissible and discussed the quantum of proof required in establishing and linking the defendant to another crime:

> "Whether the skeleton was that of Schorr and whether plaintiff in error killed him for the purpose of suppressing his testimony were questions of fact for the jury. * * *
>                    * * *
> Plaintiff in error not being on trial for his murder it was not necessary for the State to establish this fact beyond a reasonable doubt. As we have said, the weight of the facts and circumstances connected with Schorr's disappearance and the discovery and identification of his skeleton were questions of fact for the jury. The only question for us to determine is whether this evidence was properly admitted." (*People v. Spaulding* (1923), 309 Ill. 292, 302-4, 141 N.E. 196.)

Also see *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200, and *People v. Smith* (1972), 3 Ill. App. 3d 958, 279 N.E.2d 512, which followed *People v. Spaulding*. These authorities render the determination of the facts and circumstances of Katie Roessel's death and defendant's possible involvement therein a jury question. We hold that the evidence regarding that death was relevant and admissible.

Katie Roessel died in December 1971 and Herman Hanei died in December 1976. Was the death of Katie Roessel too remote in time to permit the circumstances surrounding it to serve as evidence in this case? The defendant made no point of it in his brief, but the matter was raised by questioning from the bench during oral argument. In supplemental briefs both parties have cited *People v. Carter* (1967), 38 Ill. 2d 496, 232 N.E.2d 692. There our supreme court held admissible the facts attending an attempted murder which occurred seven years prior to the one for

which defendant was on trial. Such admission was approved in the face of a specific objection to remoteness. Of course, *Carter* governs here. To the same effect as *Carter*, see 2 Wigmore, Evidence §363 (3d ed. 1940).

With further regard to the Katie Roessel matter, defendant argues that he was deprived of the right to confront the witnesses against him. The argument arises from the failure of the People to furnish tissue samples taken during the first autopsy of Katie Roessel. This autopsy was performed by Dr. Mueller on the date of her death in December 1971, and the tissue samples were taken at that time. In October 1972 the tissue samples were taken to the crime laboratory in Springfield and the Department of Public Health in Chicago, but both agencies denied ever having received the material. The defendant argues that the failure of the People to preserve "material evidence" denied him the right to confront witnesses and evidence against him and therefore deprived him of a fair and impartial trial. Defendant relies on *People v. Taylor* (1977), 54 Ill. App. 3d 454, 369 N.E.2d 573, where this court reversed a drug-based conviction when the State consumed all the questionable substance in testing without prior notice to or opportunity to participate in the testing being given defendant.

The *Taylor* case is not precisely apt, but even so, we need not discuss it since we have determined that defendant has waived his right to object to the failure of the People to produce the 1971 tissue samples.

The People freely acknowledged the existence of the 1971 tissue samples and that they were in their possession as part of an investigation of the death of Katie Roessel. These samples were apparently lost or misplaced at or about the time they were being transported to the Springfield and Chicago laboratories. This was five years before defendant was charged in this case and 5½ years before his trial. Most pertinent is the fact that discovery materials furnished the defendant on October 11, 1977, disclosed the Katie Roessel autopsy and the fact that tissue samples had been taken in that autopsy. This was over three months prior to commencement of trial. Despite this, defendant made no demand for production of the samples until the fifth day of the trial. Upon being advised of the unavailability of the samples defendant made no request for a continuance to afford time for a search for the missing samples.

In view of the lapse of time involved it is understandable that the People would be unable to produce the samples or would even have them in possession or under their control. Certainly there is no suggestion in the record, either directly or by innuendo, that the People engaged in a deliberate attempt to withhold evidence from defendant.

Even though we have found defendant to have waived the objection regarding the tissue samples it is difficult to discern any prejudice to his

case. The results of the first autopsy on the body of Katie Roessel by Dr. Mueller were not unfavorable to the defendant and he stipulated to their admission into evidence in this case. Discovery and testing of the missing tissue samples could not have improved his position vis à vis the first autopsy. On the other hand, it could have resulted in fortifying the results of the second autopsy.

The fourth amendment to the Constitution of the United States provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Its counterpart in the 1970 Constitution of the State of Illinois is found in article I, section 6. Defendant contends his rights under these constitutional provisions were violated when the court denied his motion to suppress as evidence the mortar and pestle seized from his garage in a search conducted pursuant to a warrant. Defendant's arguments are two. First, that the complaint for search warrant and the supporting affidavits are no more than conclusions, statements of innocuous facts, unsustained facts and innuendo, and contain no evidence or indication of any criminal activity by defendant. In short, the complaint and affidavits fail to show the requisite probable cause to obtain a search warrant. As an adjunct to this first argument defendant avers that neither the complaint, the affidavits nor the warrant specify the criminal conduct he is supposed to have committed. Defendant's second argument is that the warrant failed to name with particularity the items to be seized and therefore constituted a constitutionally proscribed warrant for a general search. We disagree with both of defendant's arguments.

A verified complaint for search warrant dated September 21, 1977, was jointly executed by a detective sergeant of the Alton police and a deputy sheriff of Madison County. It contained a particularly detailed description of the premises and five motor vehicles owned by defendant and requested authority to seize therefrom 11 enumerated items "which have been used in the commission of, or which constitute evidence of, criminal conduct" as follows: any substance containing thallium or any thallium salt or derivatives; any quitclaim deed to the described home of Herman Hanei; the novel *Pale Horse* by Agatha Christie (a murder mystery involving thallium poisoning); checks, receipts or notes relating to any transaction with Katie Roessel in the months of December 1971 and January 1972; any books relating to chemistry, veterinary medicine and medical science; papers, documents or instruments of any chemical

defendant has done business with; court files and notes pertaining to transfer of deeds in which defendant is a party; any record of indebtedness to the late Herman Hanei, any record of communications between defendant and business associates of defendant; any newspapers or clippings relating to Katie Roessel and Herman Hanei, personal diaries, phone books, telephone records relating to land transactions in which "Hanei" was a party; and any bank or savings and loan records of defendant and wife Gloria from 1970 to present. The complaint concluded with a recital that complainants have probable cause to believe that the listed items are located upon the described premises based upon the facts set forth in attached affidavits.

The affidavit of the police sergeant recited that chemical analysis of doughnuts submitted by the Alton Police Department contained thallium, Nora Hanei stated defendant brought doughnuts into the house from the back porch, defendant has a background of zoology, botany, law and veterinary medicine as shown by information obtained from Southern Illinois University records and close relatives, research done by affiant and other Illinois law officers revealed that thallium or thallium salts is a rare earth heavy metal, rated no. 5 on the scale of toxic substances and that very little research has been done on this element; this information was obtained from biochemists of Anheuser Busch Brewery of St. Louis, University of Missouri, Illinois Department of Public Health and Southern Illinois University at Edwardsville. The affidavit further recited that the novel *Pale Horse* by Agatha Christie contained information on how thallium can be introduced into a victim, causing death, and can rarely be traced by normal investigative resources. The affidavit then recited that on December 10, 1971, Katie Roessel telephoned a named neighbor and told her she found a nice cake all wrapped up with pretty icing on her fence post, and on December 11, 1971, she again called the neighbor and told her she was ill but would not say whether she ate the cake and on December 13, 1971, she was admitted to the hospital. Regarding the deceased the affidavit stated that close relatives asserted that defendant hated his father and threatened to get even, that defendant had a deed prepared to his father's property with himself as grantee and defendant told the attorney his father was dying of cancer whereas deceased had no cancer. The affidavit concluded by stating that defendant has a violent temper and has attacked five people for no known reason. An associate of defendant, Leo J. Sobberi, Sr., requested a doctor at a Litchfield hospital to perform a test on him for thallium, and just prior to the death of Herman Hanei defendant had attempted to borrow money from him.

The affidavit of the deputy sheriff related the death of Katie Roessel and the fact that upon a second autopsy performed upon exhumation the cause of her death was found to be thallium poisoning. This affidavit told

of the deed transaction between defendant and Katie Roessel. It also recited that copies of the will of Katie Roessel disclosed that the 160-acre farm was left to her nephew, Arthur Roessel; defendant is not mentioned in the will. The affidavit continued by stating that litigation in circuit court by Katie Roessel's beneficiaries resulted in a judgment being entered against defendant. The affidavit further states that on November 1, 1972, Arthur Roessel, 54 years of age, died at Barnes Hospital and hospital records and the death certificate stated the cause of death to be bilateral pneumonitis and thallium poisoning. Arthur's wife, Helen, was also treated at Barnes Hospital for thallium intoxication and survived. The affidavit also alluded to the death of Herman Hanei by thallium intoxication.

The search warrant issued by the circuit judge followed the form of the complaint. The return of service on the warrant listed 22 items but only the mortar and pestle were the subject of the motion to suppress.

A complaint for a search warrant must be sufficient for a judicial officer to find probable cause for the warrant, and to do so facts must be related to cause a reasonable man to believe that a crime has been committed and that evidence thereof is in the place to be searched. *People v. George* (1971), 49 Ill. 2d 372, 274 N.E.2d 26; *People v. Francisco* (1970), 44 Ill. 2d 373, 255 N.E.2d 413.

As might be expected, the cases disclose a considerable play on words in defining the probable cause that must be established to justify the issuance of a search warrant. A commonly accepted and used, as well as a realistic, definition is found in *People v. Fiorito* (1960), 19 Ill. 2d 246, 257, 166 N.E.2d 606, 613, where the supreme court stated:

" 'If there is reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged, it is a sufficient basis for the issuance of a search warrant.' *People v. Lavendowski*, 329 Ill. 223, 230.

A complaint for such a warrant is sufficient to authorize its issuance when the facts, stated and sworn to, show probable cause for the writ. It is not required that the complaint show, beyond a reasonable doubt, that the warrant should be issued. (*People v. Dolgin*, 415 Ill. 434, 441; *People v. DeGeovanni*, 326 Ill. 230, 234.)"

■■ The norm for interpretation of the contents of the complaint and affidavits for search warrants is furnished in *People v. Thomas* (1975), 62 Ill. 2d 375, 379-80, 342 N.E.2d 383, 385-86, where the court commented upon the quotes from *United States v. Ventresca* (1965), 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741, as follows:

"In *Ventresca* the court said that 'the Fourth Amendment's commands, like all constitutional requirements, are practical and

not abstract. If the teachings of the court's cases are to be followed and the constitutional policies served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts towards warrants would tend to discourage police officers from submitting their evidence to a judicial officer before acting.' (380 U.S. at 108, 13 L. Ed. 2d at 689, 85 S. Ct. at 746; 403 U.S. 573, 577, 29 L. Ed. 2d 723, 730, 91 S. Ct. 2079.) The court went on to state: 'Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. [Citation.]' 380 U.S. at 109, 13 L. Ed. 2d at 689, 85 S. Ct. 746."

We have set forth at length the averments of the complaint and affidavits to show what we believe to be a sincere effort on the part of the police officers to comply with the requirements of the fourth amendment and have regard for the rights it affords the defendant. The degree of particularity required in search warrants varies in degree with the nature of the material to be seized. (See, *e.g., Steele v. United States* (1925), 267 U.S. 498, 69 L. Ed. 2d 761, 45 S. Ct. 414; *People v. Curry* (1973), 56 Ill. 2d 162, 171, 306 N.E.2d 292; *People v. Williams* (1968), 40 Ill. 2d 522, 531, 240 N.E.2d 645.) The complaint and affidavits reveal an attempt to avoid authorization for a prohibited general search. It is apparent throughout all three documents that the search is centralized upon the means, methods and instrumentalities that might be utilized in inflicting death by thallium poisoning. More than ample evidence is disclosed to justify a judge, applying the standards set forth in the above cases, to believe that defendant had committed a crime by the use of thallium.

■■ It is understandable that the complaint and affidavits could be attended by some degree of indefiniteness in enumerating the particular items to be sought in the search. Thallium is a rare element, and the means

of storing, preparation and delivery for criminal purposes would be largely unknown to police officers and investigators. When justified consideration is given to the unique cause of death of the decedent we believe the complaint, affidavits and warrant were sufficiently specific in listing the particular items sought. The officers were obviously not scientifically knowledgable, they did not have any special training in laboratory techniques, and they had no idea what thallium looked like. They were as specific in their listing as the circumstances would allow; they were centering on thallium and its illicit administration.

■■ The fourth amendment does not prohibit all searches, only those which are termed unreasonable. In this case the search was not unreasonable. While no crime was named in the complaint and affidavits it is readily apparent that it was murder by thallium poisoning. There is no fourth amendment requirement that the crime under investigation be specified.

The case of *People v. Raicevich* (1978), 61 Ill. App. 3d 143, 377 N.E.2d 1266, *cert. denied* (1979), ___ U.S. ___, 60 L. Ed. 2d 1067, 99 S. Ct. 2409, carries an extensive analysis of the law applicable to the determination of the validity of search warrants alleged to be "general." The warrant there authorized a search for "a Colt Python handgun 357-caliber, 2½″ barrel, blue finish, serial no. 33086E and any other handguns which may be stolen." Other handguns were seized under this warrant which the trial court excluded by an order of suppression. The appellate court reversed. Their analysis and holding is pertinent here.

Defendant also contends that the court committed reversible error when it failed to give the second paragraph of Illinois Pattern Instructions, Criminal, No. 3.02 (1968) (hereinafter IPI), which defines circumstantial evidence. The omitted paragraph is: "You should not find the defendant guilty unless the facts and circumstances proved exclude every reasonable theory of innocence."

Defendant did not tender an instruction containing the entirety of IPI Criminal No. 3.02. Rather, he tendered his instructions numbered 3 and 4 which read:

"DEFENDANT'S INSTRUCTION NUMBER 3

If you find that the only credible evidence tending to show that defendant is guilty of the crime charged, is circumstantial evidence, it must be closely scrutinized, and if, when fairly considered, it presents another theory consistent with innocence, the theory which suggests innocence must be adopted in preference to guilt.

DEFENDANT'S INSTRUCTION NUMBER 4

If you find that the credible evidence linking the defendant with the alleged crime is entirely circumstantial, that evidence must

produce a reasonable and moral certainty that the accused and no one else committed the crime."

Defendant cites as authority some cases containing criticism of the IPI Criminal definition and argues that since the evidence here is entirely circumstantial, reversible error occurred.

■■ We disagree. In this case of causing death by poisoning it is direct evidence when the widow of deceased testified that defendant brought doughnuts into the house, gave one to the deceased, who ate it, almost immediately became sick and shortly thereafter died. The court was thus justified in giving IPI Criminal No. 3.02 without the second paragraph. (*People v. Schoeneck* (1976), 42 Ill. App. 3d 711, 356 N.E.2d 417.) Moreover, the court properly refused defendant's tendered instructions Nos. 3 and 4, for it is held in many cases that where a pattern instruction is applicable it must be given. Defendant's proper course would have been to tender No. 3.02 in its entirety. In any event, the omission of the second paragraph of No. 3.02 could not have contributed to the verdict of guilty and the defendant suffered no prejudice. *People v. Hunter* (1978), 61 Ill. App. 3d 588, 376 N.E.2d 1065.

■■ Defendant next argues that a sentence of 40 to 80 years is excessive. He points to his age of 56 years and the fact that he has no prior criminal record. We decline the sought reduction. Whether *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, or *People v. Choate* (1979), 71 Ill. App. 3d 267, 389 N.E.2d 670, be followed it must be concluded that the trial court did not abuse its discretion and that defendant has failed to overcome the presumptive correctness of the sentence. Granted that practically the sole aggravating factor applicable to defendant would be the nature of the offense of which he was convicted (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(a)(1)), this nevertheless sufficiently justified the sentence. The crime was heinous and insidious and required a depraved and cunning plan. We can find no circumstances of redemption which would justify modification of the sentence.

Defendant finally contends that the court erred in assessing as court costs certain statutory fees, and with this assertion we must partially agree.

The court entered a separate judgment for costs in the total amount of $5758.30. This amount included, along with other undisputed items, sheriff's fees of $504.60, witness fees of $832.40 and jurors' fees of $4311.30, all of which defendant contends are not allowable.

In *People v. Kluck* (1979), 70 Ill. App. 3d 582, 388 N.E.2d 918, this court held that jury fees could not be assessed as costs. The People ask that we reconsider this holding of *Kluck*. We have so reconsidered and have concluded that *Kluck* was correctly decided. Accordingly, the

judgment for costs must be reduced by the assessed jurors' fees of $4311.30.

Section 13 of division XIV of the Criminal Code of 1874 (Ill. Rev. Stat. 1977, ch. 38, par. 180—3) does not expressly refer to witness fees as part of the costs to be assessed by the court clerk who acts pursuant to section 22 of "An Act * * * in relation to costs" (Ill. Rev. Stat. 1977, ch. 33, par. 22). The same can be said with respect to the sheriff's fees.

Witness fees are covered by section 47 of "An Act concerning fees and salaries * * *" (Ill. Rev. Stat. 1977, ch. 53, par. 65). It is apparent from reading this statute, though, that its primary concern is payment of fees to the witness and not the taxing of the fees as costs. Nevertheless, historical practice and precedent requires the clerk to assess as costs all fees of witnesses subpoenaed to testify in the cause. Such are then the subject of a judgment against a convicted defendant pursuant to section 13 of article XIV of the Criminal Code of 1874 (Ill. Rev. Stat. 1977, ch. 38, par. 180—3).

Strangely, there appears little direct authority on the question in Illinois. But it is common knowledge that fees of witnesses are generally taxed as costs in all cases, both civil and criminal. The case of *Corbin v. People* (1893), 52 Ill. App. 355, held that the fees of a foreign witness (payable by virtue of the statute allowing fees to witnesses) are properly taxable as legal costs of a prosecution. And although the case of *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, dealt with State's attorneys' fees, we feel that it is not an overbroad interpretation of its holding to say that it should also be applicable to fees of witnesses.

The same reasoning may be applied to sheriff's fees. They are authorized by section 19 of "An Act concerning fees and salaries * * *" (Ill. Rev. Stat. 1977, ch. 53, par. 37). Section 1 of "An Act in relation to costs and fees * * *" (Ill. Rev. Stat. 1977, ch. 33, par. 29) requires the sheriff to pay into the county treasury all fees and costs collected by him (except those rightfully belonging to him) and section 1 of "An Act in relation to the compensation of Sheriffs * * *" (Ill. Rev. Stat. 1977, ch. 53, par. 37a) provides that the county shall fix the salary of the sheriff for payment by the county. As in the case of witness fees it must be said that these statutes are concerned with the right of the sheriff to receive the fees, not with their taxability as costs.

Section 19 of "An Act concerning fees and salaries * * *" (Ill. Rev. Stat. 1977, ch. 53, par. 37) as it existed prior to January 30, 1978, recited that when a defendant was acquitted without payment of costs the sheriff was to receive the fees of the case from the county. This is at least an oblique reference to the liability of a convicted defendant for sheriff's fees which were taxed as costs of the case. But we do not deem it controlling in

the result we reach. In an amendment of section 19, effective January 30, 1978, this particular language was deleted from the statute. In view of the county's ultimate liability for payment of the fees and costs of the sheriff the deleted language was redundant. The entire statutory scheme regarding sheriff's fees, salary and expenses is in keeping with article VII, section 9 of the Illinois Constitution of 1970, which prohibits the payment of the compensation and expenses of officers and employees of units of local government from fees collected.

■■ We accordingly hold that the court properly included in its judgment for costs the witness fees and sheriff's fees.

For the foregoing reasons we affirm the judgment of conviction and sentence, and we modify the judgment for costs by deleting therefrom the amount of $4311.30 which represents fees for the jury.

Judgment of conviction and sentence affirmed; judgment for costs modified to $1447 and affirmed.

KASSERMAN and SPOMER, JJ., concur.