THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DUANE LEE INGRAM, Defendant-Appellant.

Second District    No. 79-327

Opinion filed June 2, 1980.

Mary Robinson and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellant Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant was charged by a four-count indictment with: (1) murder with intent to kill or do great bodily harm to George Boatman, (2) murder of George Boatman committed in the course of the forcible felony of armed robbery, (3) armed robbery of George Boatman and (4) the attempted murder of William Harrolle.

He was found guilty by a jury of murder, armed robbery and attempt murder, and judgment was entered on each verdict. Defendant was sentenced to the Department of Corrections for 20 to 50 years for murder and 10 to 25 years for attempt murder, the sentences to run consecutively. No sentence was imposed on the armed robbery conviction. Defendant appeals the consecutive, rather than concurrent, imposition of the sentences for murder and attempt murder.

The record disclosed that Foley's Arco Station in Loves Park was robbed in the early morning hours of June 21, 1977. The attendant on duty, George Boatman, was found dead on the floor of the station by police shortly after 4 a.m., apparently as the result of severe head wounds. The police arrived at the station after encountering the attempt murder victim, William Harrolle, staggering on the street and bleeding badly from head wounds. Harrolle was confused and disoriented but told police he had been walking or hitchhiking when a car pulled up and the occupants asked him if he wanted a ride. He said "No," and they jumped out of the car and beat him up. Later, Harrolle was able to remember his name, where he worked and that he had driven to Loves Park in a black and yellow Maverick. One of the officers recalled seeing the car parked in the driveway of Foley's Arco, and he was dispatched immediately to check the station. Upon doing so, Boatman's body was found, and the station had apparently been robbed. The ambulance that had picked up Harrolle was diverted to the gas station upon discovery of Boatman's body, and upon its arrival at the gas station police said Harrolle tried to sit up and said that he remembered that he had walked in on a robbery and that he could identify the person who did it. At trial, Harrolle could not recall the ambulance pulling into the gas station, nor making that statement.

Harrolle testified he worked until 2:30 a.m. on the 21st, then went to Sambo's Restaurant in Loves Park until about 4 a.m. Upon leaving Sambo's, he went directly to Foley's Arco across the street to get $5 worth of regular gas. All the lights were on at Foley's, and a black man came out of the station. He was wearing a light brown leather-like or corduroy jacket and a blue hat that was like a golfer's cap with a large button on the top. The man, later identified by Harrolle as the defendant, Duane Lee Ingram, said they were out of regular gas, so Harrolle asked for premium. The defendant took the hose off the pump, took the gas cap off the car and put the hose in the tank. He almost immediately replaced the hose on the pump and told Harrolle the premium pump was locked and he would have to come back when the manager was there. Harrolle began to drive away, but before pulling out on the street, he looked in his rearview mirror and observed the defendant with a crowbar in his hand prying on something. Harrolle turned his car off and began walking back toward the station. The defendant opened the door to the station and asked Harrolle what he wanted. Still walking toward the station, Harrolle replied he needed cigarettes. The defendant said the machine was out of order, but Harrolle continued on into the station through the doorway, passing by the defendant sideways and face-to-face saying he would get the machine to work. Harrolle said he walked in about three steps, turned and observed Boatman's body lying on the floor by the restroom area of

the station. He could not remember anything after that, not even being struck.

Harrolle was critically injured; he was operated upon approximately five hours after the incident so that two half-dollar size pieces of skull that were pushing down on the top of his brain could be removed. Harrolle gave the police a description of the defendant on two occasions, but was unable to identify him from either three books of mug shots or a group of five pictures which were shown to him while he was in the hospital. He later picked the defendant out of a lineup on July 10, 1977, and identified him in court during trial as well. Harrolle's wallet, which had contained about $105, was found on a street in Rockford by a young boy who was out bicycling. The wallet had some papers and identification in it, but no money. The location where the wallet was found was approximately 860 feet from the defendant's residence and about four miles from Foley's Arco.

The prosecution presented three witnesses who testified they were with the defendant during the early hours of June 21: Maurice Rigsby, a nephew of the defendant; Gail Simmons, who was the mother of a child by the defendant; and 16-year-old Denise "Kay-Kay" Irby, a cousin of Gail Simmons. The three of them had accompanied the defendant from Simmons' residence to the defendant's apartment during the early morning hours of June 21. They spent a short time there with a man by the name of Henry "Little Man" Shaw. The four then left and drove to Loves Park where the defendant parked his car down the block on Riverside near the Arco station, at Second and Riverside, but not within view of it. The witnesses testified the defendant left the car for anywhere between two and 15 minutes. During that time Simmons testified they smoked marijuana and listened to music. Rigsby said Irby told him the defendant was going to "get some money" at a gas station; Irby denied saying that, and she did not recall Simmons saying anything like that either. The record further disclosed that when the defendant returned to the car, he said something to the effect of he had "hit" two dudes, or he had a fight and thought he either killed or almost killed a man and that he had knocked another man "upside the head." They all then returned to the defendant's apartment where, the record disclosed, the three witnesses observed a wallet with identification of a "Harrolle" or "Harold" in it, and an amount of money somewhere betwen $100 and $200 was being counted. Rigsby and Irby said they got none of the money and Simmons got $5 for milk and Pampers for the baby. All three witnesses testified there was a carpenter's hammer at the defendant's apartment with what appeared to be blood on it and a speck of white paint on the handle. Simmons either washed or wiped off the hammer, left it on the bathroom

floor in the defendant's apartment and testified she had not seen the hammer again. A pathologist later testified Boatman's wound would be consistent with the injury that might be inflicted by a forceful blow from a blunt instrument such as a crowbar or a monkey wrench.

The defendant was apprehended in Peoria at the home of his sister and brother-in-law, where defendant had arrived unexpectedly by bus on June 22. Defendant was discovered on July 9, concealed behind a large dresser in a bedroom, after the defendant's brother-in-law consented to a search of the premises. Defendant did not testify. Sole defense witness was Loves Park Police Sergeant Johnson, who had participated in the assistance of Harrolle when he was found wandering near Sambo's. Johnson's testimony related to the hitchhiking story Harrolle had initially given to the police while he was in a "woozy," confused and physically weak condition.

The controlling statute at the time of the offense and at sentencing on October 27, 1977, was section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—4(a)), which provided that:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective."

The test used to determine whether particular chargeable offenses are "'part of a single course of conduct during which there was no substantial change in the nature of the criminal objective'" is the "independent motivation" test. (*People v. Siglar* (1974), 18 Ill. App. 3d 381, 383.) The defendant's own perception of his motivation is not determinative; rather, all the surrounding facts must be appraised objectively to determine which of the defendant's acts were independently motivated and which were merely part of an independently motivated course of conduct.

Defendant contends the murder and attempt murder were committed in order to effectuate the armed robbery and, in support, cites *People v. Brown* (1975), 31 Ill. App. 3d 547, wherein the court held consecutive sentences for rape and aggravated kidnapping were improper where the kidnapping was committed in order to effectuate the rape. In *Brown*, however, it was clear the kidnapping was made in order to effectuate the rape because the defendant explicitly announced his intentions prior to forcing the complainant into a car. The facts in the case at bar are not as easily appraised. Defendant next cites *People v. Morgan* (1976), 44 Ill. App. 3d 459, wherein the record failed to disclose sufficient facts upon which the court could conclude defendant's criminal

objectives changed from burglary to arson upon his entry into the building and consecutive sentences were therefore improper. Defendant in this case contends there are sufficient facts in the record to permit the conclusion that the attempt murder of Harrolle was part of the robbery course of conduct since the armed robbery of George Boatman was not yet complete at the time the attempt murder of Harrolle took place. This is evidenced primarily by the fact that when Harrolle observed the defendant in his rearview mirror, he was "prying on something." Defendant further points out that all three of defendant's offenses involved the element of force, thus distinguishing the case at bar from *People v. Harris* (1976), 39 Ill. App. 3d 1043, wherein defendant's consecutive sentences for theft and battery were upheld since the former was a crime of stealth and the latter one of force.

The State cites *People v. Williams* (1975), 60 Ill. 2d 1 and *People v. Carpenter* (1976), 38 Ill. App. 3d 435, in support of its contention that the consecutive sentences were properly imposed. In *Williams,* the defendant was convicted of burglary, armed robbery, murder and felony murder and sentenced to concurrent terms for the burglary and armed robbery. The sentence imposed for murder was to run consecutively to the concurrent sentences. Defendant in that cause had contended that section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(a)), which became effective during the pendency of his appeal, was more favorable to him than the statute in effect at the time of his sentencing (Ill. Rev. Stat. 1969, ch. 38, par. 1—7(m)), and should be the standard used by the court in resolving the issue on appeal. In holding that section 5—8—4(a) was inapplicable, the court expressed its belief that the purpose of the robbers shifted, at least in part, when they shot the armed victim upon being confronted by him. The court found this to be not only a "substantial change in the nature of the criminal objective," but a departure from a "single course of conduct" as well. It determined that section 5—8—4(a) was not more favorable to defendant than section 1—7(m) and upheld defendant's consecutive sentences under the provisions of that statute. In *Carpenter*, consecutive sentences for murder, armed robbery and attempt murder were imposed on the two defendants where the court noted the original motive of the defendants was armed robbery, and the murder and attempt murder were separate and distinct acts, separately motivated and "wholly unnecessary" to the completion of the armed robbery. However, other than the statement that the convictions arose from the armed robbery of a grocery store in East St. Louis, Illinois, where a security guard was killed and a store employee injured, there are no other facts given which would indicate exactly what the surrounding circumstances of the robbery were.

Lacking such facts, it is difficult to ascertain in what respect the court found the murder and attempt murder "unnecessary" to the armed robbery, or what possible precedential value *Carpenter* exerts in the case at bar.

A case not cited by either party is *People v. Malcolm* (1973), 14 Ill. App. 3d 378. It involved an armed robbery, murder and attempt murder for which offenses consecutive sentences were upheld under section 1—7(m) of the Criminal Code of 1961 (Ill. Rev. Stat. 1969, ch. 38, par. 1—7(m)) and section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(a)), which had become effective during the pendency of the appeal. Two men had forced a 73-year-old woman, manager of a cleaning shop, at gun- and knife-point to the rear of the shop. While one man emptied the cash register, the other took a ring from the woman and was attempting to take another when the owner of the shop entered the store. The man who had been at the cash register confronted the owner with a gun and took his money. The owner struggled with the man and was shot and killed. The woman was then shot twice by the same man and stabbed seven times by the other man who had been robbing her. In spite of her wounds, the woman survived. In upholding the consecutive sentences imposed, the court noted the offenses of murder and attempt murder involved separate and distinct conduct directed toward different people. The court noted that the murder of the owner had been completed before the attempted murder of the woman and, indeed, this completed murder may have supplied a motive for the attempted murder. The court also noted that the armed robbery of the woman had been completed before the murder and attempted murder took place. This seems contrary, however, to the facts given which indicated that one of the men was still in the process of taking a ring from the woman when the owner arrived and interrupted the proceedings. Further, it is not entirely clear that the cash register had been emptied at that point either. The case at bar presents a remarkably similar fact pattern in that the evidence adduced make it seem likely that Boatman's murder was complete at the time of the attempted murder of Harrolle. The evidence also seems to indicate that the robbery of Boatman was not yet complete when Harrolle arrived, since the defendant was observed "prying on something." Additionally, the evidence shows that Harrolle was the victim of an armed robbery as well as Boatman, since three people testified to defendant's possession of a wallet belonging to a "Harrolle" or "Harold."

One aspect of the circumstances surrounding the crime to which the trial court paid particular attention was the fact that the defendant first attempted to get rid of Harrolle by coming out of the station ostensibly to service his car. When Harrolle walked back to the station and it was evident that Boatman's body would be discovered, the defendant struck

Harrolle on the head at least twice, and with such force that Harrolle could not recall being struck and required surgery within hours to remove skull fragments pushing against his brain. We are likewise attentive to this particular sequence of events and find that it figures prominently in our conclusion that the attempted murder of William Harrolle was independently motivated from the defendant's obvious criminal objective of armed robbery. It is apparent that defendant felt that he did not have to harm Harrolle in order to accomplish the robbery because he thought he could simply get him to leave the station and because at that point Harrolle had no idea what was taking place. Then, when Harrolle persisted, entered the station, and discovered Boatman's body, the defendant's criminal objective substantially changed from armed robbery to that of concealing his crime by getting rid of the witness. We have no doubt that the defendant wished to dispose permanently of the witness as evidenced by the force with which the blows must have been delivered to produce the injuries sustained. Our objective appraisal of these circumstances creates a solid foundation upon which we base our finding that the consecutive sentence imposed for attempt murder was fully warranted, and the trial court did not abuse its discretion in so imposing it. *People v. Franks* (1977), 51 Ill. App. 3d 886.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

NASH and VAN DEUSEN, JJ., concur.