THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM LEE MILLER, Defendant-Appellant.

Second District   Nos. 79—578, 81—803 cons.

Opinion filed May 17, 1983.—Supplemental opinion filed on denial of rehearing July 11, 1983.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan, for the People.

JUSTICE LINDBERG delivered the opinion of the court:

Defendant, William Lee Miller, was sentenced by the circuit court of Lake County following a jury trial to a term of seven years to run consecutively to an earlier-imposed sentence. Both sentences resulted from convictions for delivery of less than 30 grams of a substance containing heroin. (Ill. Rev. Stat. 1977, ch. 56½, par. 1401(b).) This appeal consolidates defendant's direct appeal, No. 79—578, and his appeal from the denial of his post-conviction petition challenging the imposition of a consecutive sentence, No. 81—803. The appeal from his first conviction is pending as No. 79—47. We affirm.

Defendant raises the following issues: (1) there was insufficient evidence to establish probable cause for the search warrant and the evidence seized pursuant thereto from his residence should have been suppressed; (2) the prosecutor erred when he informed the jury that defendant's alleged accomplice was in the county jail; (3) the imposition of consecutive sentences was error where defendant's acts constituted a single course of conduct with one criminal objective and where the trial court failed to state on the record that a consecutive sentence was necessary for the protection of the public; and (4) the trial court erred in sentencing defendant to a maximum term under the erroneous assumption that defendant was eligible for an enhanced

penalty.

The facts underlying the instant appeal are extensive but are summarized to clarify discussion of the particular issues. On March 16, 1978, a Waukegan police officer acquired and marked a bottle of quinine monohydrochloride, commonly used to "cut" heroin, to use to trade for heroin. On March 21, 1978, the bottle was given to Illinois Department of Law Enforcement (IDLE) undercover agent James Warren. Defendant was the target of a combined Waukegan Police Department-IDLE undercover investigation of the sale of heroin.

On March 21 agent Warren arranged for an appointment with defendant at the Rib Pit in Waukegan. After a preliminary meeting with his surveillance team, Warren confirmed his appointment with defendant. When Warren arrived at the Rib Pit, defendant was present, but soon departed with an unidentified woman. They both returned five minutes later, but the woman again exited the Rib Pit prior to Warren's conversation with defendant.

Warren spoke with defendant across the counter of the restaurant and defendant examined the quinine. Warren then informed him that the 50-gram bottle contained 96% pure quinine. Warren further indicated that he requested six packets of heroin in exchange for the quinine, but that defendant offered only four. Warren stated that he agreed to the figure with the understanding that if the quinine were satisfactory, and defendant bought the remaining two bottles, he would get a better deal.

Warren further testified that defendant instructed him to wait and departed the Rib Pit with another man. The two men drove away in defendant's car, and returned several minutes later. Upon arrival, the other man emerged from the car and entered the Rib Pit, handed Warren four tinfoil packages, and existed without any conversation. Warren later learned that the man who handed him the packets was known as Duke Jackson.

Warren followed Jackson outside, spoke briefly with defendant about supplying additional quinine, and then departed. Subsequently, Warren met with the surveillance team, and handed over the packets. They contained a brown powdery substance. A field test indicated the presence of an opiate.

Clem Ferguson testified that he was employed by the IDLE and was assigned to surveillance on March 21, 1978. Ferguson related that Warren drove into the area, parked and entered the Rib Pit. Subsequently defendant emerged from the bar and drove away in his car. Several minutes later the car returned, driven by an unidentified woman and defendant exited. Thereafter, defendant and another man,

who he later learned was named Jackson, emerged from the Rib Pit, drove away and subsequently returned. Jackson entered the bar, and exited 20 seconds later. Warren followed Jackson outside, spoke briefly to defendant, and then Jackson and defendant departed in defendant's car.

Frank Bullock, a Waukegan police detective, testified that he participated in the surveillance team on March 21. Bullock was stationed in an alley when he was advised that defendant's car was heading toward him. He followed the car to 609 May Street, defendant's residence, and then back to the Rib Pit vicinity through parallel alleyways. He stated that he never lost sight of the car. As he drove by, he noticed defendant seated on the passenger side, but could not identify the driver. He later followed the car back to defendant's home, where it made a momentary stop, and returned to the area of the Rib Pit. However, during the period of surveillance he never saw anyone enter or exit the vehicle. When it stopped, near defendant's garage, the interior light came on, but Bullock did not see anyone exit. The car remained stationary less than one minute.

Bullock further testified that he used an informant to obtain a search warrant in this investigation. He stated that the affidavit indicated the informant was inside the home within the previous 72 hours. Bullock also testified that the informant told them that he saw the (quinine) bottle on March 26, 1978, and that the item was named in the search warrant. Upon inspection of the warrant Bullock noted, however, that it commanded a search for "violation of possession of heroin."

Bullock was present when the warrant was executed. When he entered, other officers were present. He indicated that he did not know who, if anyone, preceded him into the pantry where the quinine bottle was found. It should be noted here that only the quinine bottle and no heroin was recovered in the search of defendant's residence.

David Stroz testified that he was employed as a police chemist. He received certain evidence from Bullock which he examined on April 6, 1978. He opened one of the four packets which contained heroin. The contents of the package weighed .25 grams.

During closing argument, the prosecutor informed the jury that Duke Jackson resided in the county jail. The trial court admonished the jury to disregard this statement, but denied the defendant's motion for a mistrial. Following its deliberations, the jury returned a verdict of guilty of unlawful delivery of less than 30 grams of heroin. Defendant's subsequent motion for a new trial was denied.

At sentencing, defendant testified that he had previously been

convicted of the same offense, based on the same series of transactions, and was in the process of appealing the conviction. He was sentenced to a seven-year period of incarceration to run consecutively with the sentenced imposed in the other case. His motion for reconsideration was denied.

Defendant maintains that the information contained in the affidavit of Officer Frank Bullock supporting the complaint for search warrant of defendant's residence at 609 May Street, Waukegan, was inadequate to establish probable cause. Specifically, defendant claims that the court had insufficient information to establish a reasonable belief that evidence of a crime would be found in a search of 609 May Street.

The complaint and affidavit for search warrant prepared by Officer Bullock alleges the presence of a quantity of heroin in defendant's residence at 609 May Street in Waukegan. It details four undercover heroin transactions between IDLE agent James Warren and defendant which occurred on February 16 and March 6, 21 and 28, 1978, at the Rib Pit Restaurant. During these purchases, TV sets and quinine were used for barter.

That portion of the complaint for search warrant relating to the instant offense provided:

"On March 21, 1978 James Warren of the Illinois Department of Law Enforcement telephoned William Lee Miller and advised him that he had a quantity of Quinine which he was willing to exchange for a quantity of heroin. Previous to this Frank M. Bullock of the Waukegan Police Department was advised by a confidential source that William Lee Miller wanted a specific type of Quinine, namely Quinine Monohydrochloride Dihydrate, which Frank M. Bullock on behalf of the Waukegan Police Department subsequently obtained from the Aldrich Chemical Company. Frank M. Bullock knows Quinine to be a substance used to cut Heroin prior to its sale on the street.

That Frank M. Bullock received three bottles of the above-specified Quinine and marked the label of each bottle with the No. 202028. That James Warren of the Illinois Department of Law Enforcement entered the premises of the Rib Pit at 702 McAlister at about 7:20 p.m. and met with William Lee Miller and had a drug related conversation concerning the exchange of Quinine for Heroin. Subsequent to this conversation William Lee Miller exited the Rib Pit, entered his white over red Cadillac bearing 1978 Illinois Plates YE 8160 which Miller drove to the rear of his home at 609 May Street. That subsequently Wil-

liam Lee Miller returned to the Rib Pit and an individual named Duke Jackson, an individual known to associate with William Lee Miller, delivered to James Warren four tinfoil packets containing a brown powdery substance that was subsequently field tested and was positive for the presence of an opiate. Frank M. Bullock, that night, had a conversation with James Warren in which Warren advised him that he handed to William Lee Miller a single bottle of the above-described Quinine and that Miller agreed to give Warren four tinfoil packets of heroin which he in fact received from Duke Jackson.

\* \* \*

Frank M. Bullock states that on the 26th day of March, 1978 a reliable informant was within the confines of the above-described premises and the informant did see a brown bottle bearing the markings of the Aldrich Chemical Company. The informant states that this bottle was in the kitchen area of the above-described premises. Your Affiant states that the informant has provided information leading to the arrest of three individuals and the conviction of one for felony charges. Your Affiant further states that the informant further provided numerous information which your Affiant has validated through investigation.

For the above stated reasons your Affiant believes that there is located in the above-described premises a quantity of heroin, in violation of Section 1401 and 1402, Chapter 56½, Illinois Revised Statutes, 1977."

Additionally the complaint detailed the results of Officer Bullock's observations at defendant's residence on the other occasions in the following manner:

*February 16, 1978*—defendant drove "to the rear of his home at 609 May Street" and then returned to the Rib Pit whereupon the heroin transaction took place.

*March 6, 1978*—defendant was "observed leaving his residence at 609 May Street" and driving to the Rib Pit restaurant after Warren had telephoned defendant to arrange a transaction which then took place at the Rib Pit.

*March 29, 1978*—Officer Bullock stated that "Tyrone Prater was observed leaving the residence of [defendant] at 609 May Street and entering the Rib Pit immediately before he [Prater] turned over the nine bags of heroin to James Warren." Warren exchanged two bottles of quinine for the heroin, all in the presence of defendant and pursuant to a drug-related conversation

between Warren and defendant.

On the basis of the complaint for search warrant, the warrant was issued and executed. A quinine bottle was the only evidence seized and was the subject of defendant's pretrial motion to suppress which was denied.

## I

Defendant contends that a careful examination of the complaint for search warrant discloses the absence of any information establishing probable cause to believe that heroin could be found at 609 May Street. Nor is it apparent from the complaint that defendant did not have time to acquire the drugs from another location. (See *People v. Clark* (1981), 95 Ill. App. 3d 496, 420 N.E.2d 259.) Defendant also contends that Prater's departure from 609 May Street is meaningless absent information concerning Prater's earlier whereabouts. Further, defendant is critical of the significance of the alleged informant having seen the quinine bottle in the premises eight days prior to the complaint for search warrant.

Thus, defendant maintains that the second requirement of *People v. George* (1971), 49 Ill. 2d 372, was not met. The supreme court in *George* held that probable cause must be apparent from a review of the complaint and consists of two elements: (1) facts must be set forth which would cause a reasonable person to believe that a crime had been committed; and (2) facts must be related which would cause a reasonable person to believe the evidence was in the place to be searched. (49 Ill. 2d 372, 377.) Defendant does not contest the existence of the first element of *George* in this appeal.

The State simply maintains that the allegations of the complaint established probable cause citing *United States v. Ventresca* (1965), 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741, for the proposition that the probable cause standard is less than the reasonable doubt standard for conviction. The State also relies on *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584, which held that only a probability and not a *prima facie* case is required for a search warrant. The State finds the delay of eight days between the informant's viewing of the quinine bottle and the issuance of the warrant not fatal to the establishment of probable cause. (*People v. Montgomery* (1963), 27 Ill. 2d 404.) *People v. Clark* (1981), 95 Ill. App. 3d 496, 420 N.E.2d 259, is distinguished by the State because there the affiant did not have personal knowledge of defendant's criminal acts and the credibility of the informant had not been established. Finally, the State relies on *People v. Hammers* (1976), 35 Ill. App. 3d 498, 341

N.E.2d 471, as controlling under the facts of this case.

■ The Illinois Supreme Court has said that affidavits in support of search warrants are to be tested and interpreted in a common-sense and realistic fashion rather than a hypertechnical one (*People v. Thomas* (1975), 62 Ill. 2d 375, 381), and the determination of whether probable cause exists to support a search warrant requires a pragmatic analysis of everyday life on which reasonable and prudent men, not legal technicians, act. (See *People v. Blitz* (1977), 68 Ill. 2d 287, 292.) Affidavits should not be found deficient through hypertechnical scrutiny. *United States v. Ventresca* (1965), 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741.

As observed in *People v. Hanei* (1980), 81 Ill. App. 3d 690, 703, 403 N.E.2d 16, the cases disclose a considerable play on words in defining probable cause. The court there quoted as a commonly accepted and realistic definition the language in *People v. Fiorito*:

 " 'If there is reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged, it is a sufficient basis for the issuance of a search warrant. [Citation.]

 A complaint for such a warrant is sufficient to authorize its issuance when the facts, stated and sworn to, show probable cause for the writ. It is not required that the complaint show, beyond a reasonable doubt, that the warrant should be issued. [Citations.]' " *People v. Fiorito* (1960), 19 Ill. 2d 246,257.

The alleged deficiency in *People v. Hanei* (1980), 81 Ill. App. 3d 690, 403 N.E.2d 16, was the lack of specificity as to the items sought in the search. Here the item, heroin, was not indefinite. The *existence* of heroin in the residence of defendant is the alleged deficiency. Under the facts of the case at bar, we see no distinction. In each of the heroin sales two locations, the Rib Pit and 609 May Street, were the locus of the transactions. A consistent pattern was established by the four transactions. It would appear probable to a reasonably cautious and independent magistrate that the heroin was being maintained at 609 May Street before being transported to the Rib Pit for delivery. It cannot be said that the issuance of the warrant was based only upon a possibility or upon speculation or conjecture.

■ The fact that defendant, Jackson and Prater left defendant's home prior to each of three of the controlled sales was convincing evidence of probable cause. The magistrate was entitled to render a judgment of probable cause based upon the common-sense reading of the entire affidavit. (*United States v. Ventresca* (1965), 380 U.S. 102,

109, 13 L. Ed. 2d 684, 689, 85 S. Ct. 741, 746.) There was sufficient information from which the magistrate could conclude that defendant was engaged in the sale of large quantities of narcotics. Furthermore, the search was limited to the defendant's residence. *State v. Watson* (1976), 113 Ariz. 218, 220, 550 P.2d 89, 91; see 1 W. LaFave, Search and Seizure sec. 3.2, at 486-87 (1978).

In a recent case, we approved the issuance of a search warrant of a suspect's house which was one to 1½ miles from the place where the body of a homicide victim was found. At the scene, a charge receipt was located near the victim bearing the suspect's name, residential address and was dated the day preceding the day the victim's body was discovered. We held that the sales receipt, bearing so recent a date and found near the body, established the probability that defendant was linked to the offense so as to reasonably permit the search of his residence. *People v. Wolski* (1980), 83 Ill. App. 3d 17, 403 N.E.2d 528.

In *People v. Mitchell* (1978), 61 Ill. App. 3d 99, 377 N.E.2d 1073, a finding of probable cause to search a suspect's house was supported by the affiant's reasonable belief that the suspect had killed his former mother-in-law in Berwyn. There, the suspect's ex-wife told the affiant police officer by telephone from Florida that her ex-husband had just beaten her and her father and had returned to his home in Bartlett, Illinois. She said she knew he was at home in Bartlett because he had just answered her telephone call to that location.

The court concluded that because the affiant had sufficient information to believe the suspect had killed his former mother-in-law, it was probable that evidence of the crime would be found in the suspect's residence. In that case, neither the affiant nor his informant, the suspect's former wife, had seen the evidence sought in the place desired to be searched. Nonetheless, based upon the probability that evidence of the suspect's crime would be found in his residence, the court found no error in the denial of the motion to suppress.

Further, in *People v. Hammers* (1976), 35 Ill. App. 3d 498, 341 N.E.2d 471, the court found reasonably sufficient the affidavit of what appeared to be a police officer and which consisted largely of hearsay of an alleged eyewitness. The court concluded that the affidavit established probable cause to believe that the defendant shot and killed the victim and, therefore, the issuing judge could reasonably infer that the weapon used might be at defendant's home nine days later. The denial of the motion to suppress was affirmed.

■ Defendant's reliance on *People v. Clark* (1981), 95 Ill. App. 3d 496, 420 N.E.2d 259, is misplaced. This court concluded in *Clark* that

the second prong of the *Aguilar* test (*Aguilar v. Texas* (1964), 378 U.S. 108, 114, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509, 1514) had not been satisfied and the complaint for search warrant was properly quashed. The question there was whether a substantial basis existed for the magistrate to credit the hearsay of the affiant's informant. In the case at bar, the affiant did not rely upon his informant for his basis of belief that heroin was in the premises at 609 May Street. While the informant's original statements to the police were the basis for the four controlled purchases of heroin which subsequently took place, the complaint for search warrant was actually based on direct police observation of the activity at 609 May Street. It was not necessary for the magistrate to rely on the affiant's information from his informant regarding the existence of the quinine bottle since the circumstances of the controlled purchases adequately established the probable cause. The search warrant was not sought for the purpose of the quinine bottle, but rather for the seizure of heroin. In any event, we further observe that a substantial basis for crediting the informant is contained within Officer Bullock's complaint and affidavit for search warrant. There was no error in the denial of the motion to suppress. The quinine bottle was seized pursuant to the search warrant for heroin. The search warrant was based upon probable cause.

## II

■ Defendant next contends that the jury's independent determination of defendant's guilt or innocence was tainted by a prosecutorial remark in closing argument. The prosecutor said:

"MR. CONROYD: Where is Duke Jackson? He is over in the County Jail. He can call him just as quickly as I can call him."

Defendant's position is that since he was tried on a theory of accountability for Jackson's conduct, the suggestion that he is in jail would imply to the jury that Jackson has already been convicted of the instant offense and therefore, defendant would be denied the presumption of innocence. Defendant maintains that such prosecutorial conduct was condemned in *People v. Sullivan* (1978), 72 Ill. 2d 36, and *People v. Poll* (1979), 74 Ill. App. 3d 534, 393 N.E.2d 732. He also distinguishes *People v. Miller* (1981), 101 Ill. App. 3d 1029, 428 N.E.2d 1038, where the court found the error not prejudicial because the defendant had invited the error.

The State maintains the error was invited by the defendant when the defense counsel said during closing arguments:

"MR. WILSON: Where is Duke Jackson? Why don't they bring him here. They haven't even explained his situation."

We agree that defendant cannot claim error where the prosecutor's remarks are in reply to and in fact were invited by defense counsel's argument. *People v. Dixon* (1982), 91 Ill. 2d 346; *People v. Vriner* (1978), 74 Ill. 2d 329; *People v. Zuniga* (1973), 53 Ill. 2d 550; *People v. Miller* (1981), 101 Ill. App. 3d 1029, 428 N.E.2d 1038.

Also we agree that the prosecutor was entitled to answer the second part of defense counsel's question to the jury. It was defense counsel who asked "[w]here is Duke Jackson?" Without the prosecutor responding as to Jackson's precise whereabouts, the jury would be left to speculate as to Jackson's whereabouts. The State was entitled to explain Jackson's absence from the trial when defendant made it an issue in closing argument. The defendant cannot complain where he has opened the door and invited comment on inadmissible evidence. (*People v. Miller* (1981), 101 Ill. App. 3d 1029, 428 N.E.2d 1038.) Additionally, the jury was admonished and under these circumstances we do not believe defendant was denied a fair trial. *People v. Dixon* (1982), 91 Ill. 2d 346.

### III A

■ Defendant contends that his deliveries of substance containing heroin to agent Warren on March 6 and 21 were a single course of conduct during which the nature of the criminal objective didn't substantially change. Defendant claims it was error to impose a consecutive sentence for the March 21 conviction where section 5—8—4(a) of the Unified Code of Corrections prohibits consecutive sentences under such circumstances. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(a).) Section 5—8—4(a) provides in part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court." Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(a).

In support of there being a single course of conduct without change in the criminal objective, defendant states that indictments for both the March 6 and March 21 offenses were handed down the same day. In both cases, defendant exchanged the heroin for a "prop" from agent Warren at the same location and the deliveries were in the context of a single investigation. Finally, defendant contends that during

the sentencing hearing the State acknowledged that there was a "course of conduct" when it requested a consecutive sentence for the March 21 offense.

Defendant relies upon the language of *People v. King* (1977), 66 Ill. 2d 551, 565, a case involving the imposition of a concurrent sentence, for its analysis of section 5—8—4(a). There the supreme court observed that in enacting section 5—8—4(a), the legislature recognized the prejudice which results from consecutive punishment for multiple offenses motivated by the same criminal objective. The court said that criminal objective is relevant to whether a consecutive sentence can be imposed.

Defendant also relies on *People v. Fieberg* (1982), 108 Ill. App. 3d 665, 439 N.E.2d 543, and this court's decision in *People v. Ingram* (1980), 84 Ill. App. 3d 495, 405 N.E.2d 864. In *Ingram*, we held that the test to determine whether particular chargeable offenses are part of a single course of conduct, during which there was no substantial change in the nature of the criminal objective, is the independent motivation test. That is, all the surrounding facts must be appraised objectively to determine which acts were independently motivated and which were merely part of an independently motivated course of conduct. 84 Ill. App. 3d 495, 501, 405 N.E.2d 864.

The State maintains that defendant's offenses on March 6 and March 21 were not part of a single course of conduct and were not motivated by the same criminal objective. The State relies on *People v. Brownfield* (1976), 52 Ill. App. 3d 829, 366 N.E.2d 308. There, the defendant had sold an undercover agent a gram of a substance containing heroin. The agent thereupon obtained a search warrant and seized 37.9 grams of a substance containing heroin in the defendant's refrigerator. In *Brownfield*, the court found that the one gram unit and the 37.9 gram unit to be separate "batches" and, together with the separate conduct of defendant's delivery and possession, concluded each offense was a separate act. The court further observed that each offense required different elements of proof. The consecutive sentence was not barred by section 5—8—4(a). However, in *Brownfield* the defendant was appealing a *concurrent* sentence. We therefore do not believe the instant case is controlled by *Brownfield*.

In *People v. Garrett* (1978), 57 Ill. App. 3d 906, 373 N.E.2d 792, a case strikingly similar to the instant case, the defendant's consecutive sentence was affirmed although the issue of the instant appeal was not directly addressed. There, the presentence report disclosed defendant's plea of guilty to three counts of unlawful delivery of a controlled substance. Each count related to three separate deliveries

by defendant to the same Metropolitan Enforcement Group (MEG) agent in another county on February 19, and March 19 and 25, 1975. The last delivery occurred only two days before the delivery upon which the appeal was based and, in every pertinent regard, was the same as the previous three deliveries except as to the county in which it occurred. The defendant's conviction and consecutive sentence were affirmed.

We conclude that defendant's deliveries on March 6 and 21 were not part of a single course of conduct. (See *People v. Brownfield* (1976), 52 Ill. App. 3d 829, 366 N.E.2d 308.) Furthermore, we believe defendant's criminal objective on March 21 was not the same as his criminal objective on March 6. We do not believe the facts of this case bring it within the prohibition of section 5—8—4(a).

On March 6, defendant's conduct was the exchange and sale of six packets of heroin in addition to $30 for a General Electric 19-inch television set. His criminal objective was the delivery of a controlled substance for valuable consideration. On March 21, defendant's conduct was similar in that he had arranged for Duke Jackson to deliver four tinfoil packets of heroin, in defendant's presence, in exchange for which defendant received a bottle of quinine. We do not rely upon this slight variation in the facts for our holding. Rather, as in *Brownfield*, separate and distinct units of controlled substance were delivered. Further, they were not delivered simultaneously, but instead pursuant to separate transactions occurring at different times.

Additionally, while defendant engaged in a general course of conduct wherein he was convicted of committing two offenses of the same nature, *i.e.*, delivery of controlled substances, it was not the "single course of conduct" contemplated by section 5—8—4(a). As the court noted in *People v. King* (1977), 66 Ill. 2d 551, this section was enacted in 1973 in recognition of the prejudicial effect of a double punishment for multiple offenses motivated by the same criminal objective. In arriving at this conclusion, the court analyzed those cases where defendants were sentenced for multiple offenses incidental to or motivated by some greater criminal objective. Defendant's March 21 delivery to agent Warren in the instant case was not incidental to or motivated by defendant's delivery on March 6. In fact, other than delivering to the same person in the same location, everything else about defendant's conduct and criminal objective was different. Further, in each the criminal objective was satisfied and completed upon the delivery of the agreed consideration.

Defendant cites no authority nor suggests any rationale for merging the two acts into the same conduct by reason of the indictments

for both offenses being handed down on the same day. Nor do we perceive how the two acts are joined merely because they were subject to the same undercover investigation.

The record discloses this statement by the State during sentencing:

"MR. CONROYD: The Defendant in this case shows he is not a petty distributor. It shows a course of conduct, delivery on March 6, delivery on March 21. I ask at this time that the sentence imposed be a sentence of seven consecutive years."

Defendant contends that this statement is an admission by the State that the acts were a single course of conduct for the purpose of section 5—8—4(a). For the reasons previously stated, we do not believe defendant's offenses were a single course of conduct. Nor do we believe the State intended to so suggest in light of the context of the statement, wherein the State was urging the imposition of a consecutive sentence.

B

■ Defendant next contends the imposition of a consecutive sentence was improper where an element of section 5—8—4(b) was not met (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(b)). It provides:

"The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(b).

Relying on *People v. Pittman* (1982), 93 Ill. 2d 169, defendant argues that the trial court failed to make the required finding that a consecutive term was required to protect the public from defendant's further criminal conduct. There the court held that the imposition of a consecutive sentence does not imply that the trial court was of the opinion that the consecutive term was necessary so as to satisfy the statutory requirement. The court held, however, that although a finding in the language of the statute is preferred, the failure to do so does not require reversal. The *Pittman* court in affirming a consecutive sentence relied upon the trial court's review of the defendant's prior history of serious narcotic-related convictions as a valid basis under the statute for the imposition of a consecutive sentence. The supreme court noted that one of the defendant's prior offenses was for unlawfully selling or furnishing cocaine. 93 Ill. 2d 169, 177-78.

Similarly in the instant case the court observed in pertinent part:

"This is the second time that the Defendant has been found guilty of the same charge. It does not come in the section providing for an enhancement of penalties. I don't think that counsel is really asking for an enhancement of that, only asking that the sentence that we pronounced today be made to be served not concurrently, but consecutively to the sentence before.

I think the offense of delivery of narcotics, drugs goes without saying to be one of the worst offenses that a person can commit considering the degredation [*sic*] of the people who use these drugs and especially if the person who is dealing in it, delivering it is not an addict himself, but is delivering solely for the profit that he can get out of it.

I think the evidence indicates that that was the type of transaction that went on in this case, and I think it also indicates that he was not a small dealer.

When I think of all the factors of the case, I don't think it is asking too much by the State that he be given a consecutive sentence. I think the State could have very easily asked for more than a consecutive sentence, but could have asked for double the sentence under the section I alluded [to] before."

The language of the trial court, like that in *Pittman*, did not follow the precise words of the statute. Nonetheless, it conveys the trial court's regard for the nature and circumstances of the offense. The court viewed the offense as among the worst that a person can commit. The court expressed its analysis of the history and character of defendant as a second-offense deliverer of narcotics for profit. The trial court's reference to the degradation of the people who use the narcotics in which this defendant deals supplies an adequate basis for the imposition of a consecutive sentence to protect the public from the further criminal conduct of the defendant. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(b).

■ Finally, this court has recently held that where the defendant has not claimed that the sentence would have been different had the court stated further reasons for its determination, there is no prejudice due to any failure to specify said reasons for the sentence ultimately imposed. (*People v. Peacock* (1982), 109 Ill. App. 3d 684, 440 N.E.2d 1260.) As the court stated in *People v. Riley* (1981), 99 Ill. App. 3d 244, 424 N.E.2d 1377, had the defendant wished greater specificity, he should have requested it at the time of sentencing.

We are unpersuaded by defendant's additional authority of *People*

*v. Griffin* (1982), 113 Ill. App. 3d 184, 446 N.E.2d 1175, where the court reduced the defendant's four consecutive sentences for four conspiracy and theft-by-credit-card offenses to concurrent sentences. The court found that the offenses were nonviolent, no weapon was used and they involved consensual retail purchases. The court disagreed with the trial court and found that consecutive sentences were not required for the protection of the public. We believe the case to be inapposite on its facts to the case at bar because of the considerably greater danger to the public presented by a dealer in heroin.

## IV

Defendant contends that the language of the trial court quoted earlier evinces a mistaken belief that defendant was eligible for an enhanced penalty under section 408(b) of the Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, par. 1408(b)). He maintains that the cause must be remanded for resentencing because the trial court's error as to the availability of a sentence twice the maximum term otherwise authorized may have affected the trial court's sentencing judgment. Defendant relies on *People v. Phillips* (1978), 56 Ill. App. 3d 689, 371 N.E.2d 1214 (Jones, J., dissenting), where the majority determined that enhancement is only available for second offenses which were committed after the initial conviction. Section 408(b) provides in relevant part:

> "(b). For purposes of this Section, an offense is considered a second or subsequent offense, if, prior to his conviction of the offense, the offender has at any time been convicted under this Act or under any law of the United States or of any State relating to controlled substances." Ill. Rev. Stat. 1977, ch. 56½, par. 1408(b).

The majority in *Phillips* construed the statute as precluding enhancement under the facts of that case where enhancement was based upon two offenses involving controlled substances occurring the same day as the offense being appealed. The majority concluded that enhancement statutes were intended to provide a warning to a first offender and that under the circumstances of that case since the defendant had not been convicted before embarking upon his third offense he was not afforded the opportunity to disengage in criminal activity. The case was remanded for resentencing. *People v. Phillips* (1978), 56 Ill. App. 3d 689, 695, 371 N.E.2d 1214, citing *People v. Klemick* (1941), 311 Ill. App. 508, 511, 36 N.E.2d 846.

The State appears to concede that *Phillips* precludes enhancement where the earlier conviction did not precede the enhanced-sen-

tence offense as in the case at bar. The State relies instead on defendant's earlier Federal conviction for a cannabis-related offense. Clearly, a cannabis offense is not a conviction "relating to controlled substances" and the State's argument must be rejected. *People v. Sanders* (1977), 47 Ill. App. 3d 180, 361 N.E.2d 884.

Additionally, defendant relies upon *People v. Marquis* (1977), 54 Ill. App. 3d 209, 369 N.E.2d 372. There, the court remanded for resentencing because the trial court was under the mistaken belief that defendant had committed a Class A misdemeanor when in fact the penalty was a Class B misdemeanor. The maximum determinant sentences under these classifications were one year and six months respectively. Defendant was sentenced to 90 days, which is below the maximums for both classifications. Nonetheless the court, relying on *People v. Brooks* (1977), 50 Ill. App. 3d 4, 364 N.E.2d 994, remanded for resentencing free of any misunderstanding as to the limits of the sentence to be imposed. In *Brooks*, the trial court had mistakenly believed the offense was punishable by a four-year minimum sentence and used that belief as a reference, creating doubt in the reviewing court as to whether the trial court would have imposed the 10-year minimum sentence absent the mistaken belief.

We believe the case at bar is distinguishable from the cases relied upon by defendant. It is clear from the record that the trial court in the instant case made no error in concluding that defendant was eligible for a consecutive sentence. The trial court's statement regarding the availability of an enhanced sentence cannot be said to be the basis upon which it entered a consecutive sentence. The court articulated other substantial statutory bases for its imposition of the consecutive sentence. The record fails to indicate that the trial court's belief that an extended term could be imposed played any part in the sentence which it did impose. (See *People v. Rush* (1980), 91 Ill. App. 3d 366, 414 N.E.2d 899.) The other cases relied upon by the defendant, *People v. Killen* (1982), 106 Ill. App. 3d 65, 435 N.E.2d 789, and *People v. Peace* (1980), 88 Ill. App. 3d 1070, 411 N.E.2d 334, are distinguishable because in *Killen* the court found that the trial court short-circuits the sentencing procedure when it proceeds to a finding necessary for imposing an extended term, without first considering the factors in aggravation and mitigation (106 Ill. App. 3d 65, 67). Additionally, the court found that the finding under section 5—5—3.2(b)(2) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)) of heinous or brutal behavior accompanying the offense was in error. In the instant case the trial court heard and considered evidence in aggravation and mitigation before entering the consecutive sentence and the sentence

was one authorized under the law (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(b))). In *People v. Peace* this court was unable to determine what role the court's erroneous belief may have played in its sentencing of defendant. Such is not the case here where the trial court made it unmistakably clear what was the bases for the imposition of the consecutive sentence.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

SEIDENFELD, P.J., and HOPF, J., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE LINDBERG delivered the opinion of the court:

Defendant petitioned for rehearing on the issues of the validity of the search warrant and our determination that the two sales were not a single course of conduct. We find defendant's petition without merit as to those issues.

■ However, defendant aptly notes that his final argument attacked both the consecutive and the *maximum* nature of the sentence as being the product of the trial court's misapprehension concerning the availability of an enhanced sentence for this defendant. Neither the State nor this court's opinion specifically addressed the effect the alleged misapprehension may have had on the trial court's imposition of the *maximum*, as well as consecutive, sentence.

In his petition defendant reasserts his reliance on our opinion in *People v. Peace* (1980), 88 Ill. App. 3d 1090. However, in the instant case we are not confronted with the quandary the court faced in *People v. Peace*. Here the trial court made it clear in its remarks at sentencing that it was aware that defendant's earlier conviction did not qualify him for an enhanced penalty. In fact, the judge specifically found that the instant conviction "does not come in the section providing for enhanced penalties." He further expressed a specific awareness that the State was not asking for an enhanced penalty.

Under these circumstances, his later statement that the State could have very easily *asked* for double the sentence under the enhancement provision cannot be construed to indicate that he believed he could have *imposed* such a sentence.

For this reason and the reasons expressed in the principal opinion on this issue we find no error in the trial court's imposition of the maximum penalty of seven years consecutive to the earlier-imposed

sentence. We adhere to our original opinion and deny defendant's petition for rehearing.

Petition for rehearing denied.

SEIDENFELD, P.J., and HOPF, J., concur.